**Richard L. DePROSPERO, Acting Regional Director of the Third Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,**

v.

**The HOUSE OF the GOOD SAMARITAN and the Samaritan-Keep Nursing Home, Inc., Respondents.**

**No. 78–CV–495.**

United States District Court, N. D. New York.

Nov. 21, 1978.

Doren Goldstone, Third Region, N. L. R. B., Buffalo, N. Y., of counsel, for petitioner.

Willmott, Wisner, McAloon & Scanlon, Watertown, N. Y., Daniel Scanlon, Jr., Watertown, N. Y., of counsel, for respondents.

## MEMORANDUM–DECISION AND ORDER

MUNSON, District Judge.

The acting Regional Director of the National Labor Relations Board has commenced this proceeding pursuant to 29

U.S.C. § 160(j), seeking a preliminary injunction to restrain the respondents from further violating the National Labor Relations Act through their refusal to bargain with the Licensed Practical Nurses and Technicians of New York, Inc., Local 721, Service Employees International Union, AFL–CIO–CLC (Local 721). The Court scheduled a hearing to determine the underlying facts, at which time the parties entered into a stipulation establishing subject matter jurisdiction and conceding, for the limited purposes of this proceeding, that the Regional Director had reasonable cause to believe that an unfair labor practice has been committed. As a result, the only remaining issue is whether temporary injunctive relief would be "just and proper" in the circumstances of this case.

## BACKGROUND

The House of the Good Samaritan and the Samaritan-Keep Nursing Home, Inc. are nursing care facilities in Watertown, New York. On September 13, 1974, the licensed practical nurses employed by the respondents elected the Licensed Practical Nurses of New York, Inc. as their collective bargaining representative. Since this time, the respondents have consistently dealt the Licensed Practical Nurses of New York as the exclusive representative of their employees and have entered into successive collective bargaining agreements covering the period from September 13, 1974, through August 31, 1978. This working relationship persisted until June 7, 1978, when the nursing homes refused to negotiate a new contract with the union, claiming that it no longer represented the employees.

To understand the employers' position, it is necessary to recount that on May 21, 1978, the Licensed Practical Nurses of New York, Inc. entered into a permanent affiliation agreement with the Service Employees International Union, AFL–CIO–CLC and thereafter became known as the Licensed Practical Nurses and Technicians of New York, Inc., S.E.I.U., AFL–CIO–CLC. However, taking the position that Local 721 is a new union, the nursing homes have refused to bargain with them. Thus, on July 14, 1978, the union was compelled to file a charge with the NLRB, as a result of which, General Counsel investigated the allegations and issued a complaint on August twenty-first. The acting Director of the Third Region then petitioned this Court for a temporary restraining order on October 4, 1978, at which time a stipulation was offered and testimony was taken concerning the propriety of injunctive relief.

The parties' stipulation established that, for the purposes of this proceeding, there is reasonable cause to believe that the nursing homes have been, and continue to be, committing an unfair labor practice by refusing to recognize and negotiate with Local 721. As noted in the margin, this Court has found a jurisdictional basis for this proceeding,[1] and has taken testimony concerning the potential for irreparable injury should preliminary injunctive relief be denied. This testimony has disclosed that if a restraining order is not issued, the employees may strike in an effort to force their employer to negotiate a new contract. Moreover, the respondents' continued refusal to bargain will probably weaken the union's strength and may very well result in net annual losses to some of the employees.

## GENERAL PRINCIPLES

Section 10(j) of the National Labor Relations Act provides for the issuance

---

1. Annually, the respondents, in the course and conduct of their business operations, provide health care services, the gross value of which exceeds $250,000. During the same period of time, the respondents purchased and received goods valued in excess of $1,000, transported to their places of business through interstate commerce directly from states of the United States other than New York.

The union is an organization in which employees participate and which exists for the purpose, in whole or in part, of dealing with employee grievances concerning labor disputes, wages, hours, rates of pay, and conditions of employment. It is therefore a "labor organization" within the meaning of 29 U.S.C. § 152(5).

At all times material herein, the union and the respondents have been transacting business and performing their organizational functions within this judicial district.

of a temporary restraining order pending the final disposition of an unfair labor practice charge. 29 U.S.C. § 160(j). An order granting this type of preliminary relief is appropriate where:

(1) there is reasonable cause to believe that an unfair labor practice has been committed; and

(2) such relief is "just and proper".

*Seeler v. Trading Port, Inc.*, 517 F.2d 33 (2d Cir. 1972).[2] In passing upon the evidence presented in support of a 10(j) application, the petitioner will be entitled to the benefit of whatever inferences may reasonably be drawn. *Danielson v. Joint Board of Coat, Suit & Allied Garment Workers' Union, ILGWU*, 494 F.2d 1230, 1245 (2d Cir. 1974). However, the District Court's role in a 10(j) proceeding is limited to ascertaining whether the foregoing criteria have been satisfied and it will not determine which party should ultimately prevail. *N. L. R. B. v. Acker Industries, Inc.*, 460 F.2d 649, 652 (10th Cir. 1972); *Angle v. Sacks*, 382 F.2d 655, 661 (10th Cir. 1967).

## REASONABLE CAUSE

■■ The right of a union local to continue collective bargaining on behalf of its constituents following affiliation with an international union turns on a factual issue—is the "new" union a continuation of the old organization under a new name and affiliation, or is it a substantially different representative? *National Labor Relations Board v. Newspapers, Inc.*, 515 F.2d 334 (5th Cir. 1975); *N. L. R. B. v. Commercial Letter, Inc.*, 496 F.2d 35, 39 (8th Cir. 1974); *N. L. R. B. v. Hershey Chocolate Corp.*, 297 F.2d 286 (3rd Cir. 1961); cf. *Abrams v. Carrier Corp.*, 434 F.2d 1234, 1243–1244 (2d Cir. 1970), cert. den. 401 U.S. 1009, 91 S.Ct. 1253, 28 L.Ed.2d 545 (1971). In making this determination, the Board will consider whether the employees still control their union officers and whether these officers continued to represent the employees after the affiliation. *American Bridge Division,*

*U. S. Steel Corp. v. N. L. R. B.*, 457 F.2d 660, 663 (3rd Cir. 1972). The Board will also consider whether the affiliation was achieved in a democratic manner, whether the Local continued to function as it had before, and whether the prescribed affiliation procedures had been followed. *Union Carbide Corp. v. NLRB*, 116 NLRB 491 enfd. 244 F.2d 672 (6th Cir. 1957). Thus, by conceding that the Regional Director has reasonable cause to believe that an unfair labor practice has been committed, the respondents have stipulated that for the limited purposes of this proceeding, the Court may assume that these tests have been satisfied and conclude that Local 721 is merely a continuation of the original employee organization. Accordingly, I find that there is reasonable cause to believe that an unfair labor practice has been committed.

## PROPRIETY OF INJUNCTIVE RELIEF

■ The purpose of section 10(j) and 10(*l*) is clearly articulated in the legislative history of the National Labor Relations Act. Senator Taft's report explains:

Experience under the National Labor Relations Act has demonstrated that by reason of lengthy hearings and litigation enforcing its orders, the Board has not been able in some instances to correct unfair labor practices until after substantial injury has been done. Under the present act the Board is empowered to seek interim relief only after it has filed in the appropriate circuit court of appeals its order and the record on which it is based. Since the Board's orders are not self-enforcing, it has sometimes been possible for persons violating the act to accomplish their unlawful objective before being placed under any legal restraint and thereby to make it impossible or not feasible to restore or preserve the status quo pending litigation. *See* 1 Legislative History of the Labor Management Relations Act, 1947, 433.

---

2. See also, *Eisenberg v. Hartz Mountain Corp.*, 519 F.2d 138, 141 (3rd Cir. 1975); *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, cert. den. 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976).

However, after reviewing the legislative history in its entirety, the Second Circuit has repeatedly concluded that Congress did not intend to supplant the District Courts' equitable powers, thereby requiring them to grant injunctive relief in instances where it would not otherwise be appropriate under traditional equitable principles. *Danielson v. Joint Board of Coat, Suit, and Allied Garment Workers' Union,* 494 F.2d 1230, 1241–1242 (2d Cir. 1974); *Danielson v. Local 275 Laborers International Union of N. America,* 479 F.2d 1033, 1037 (2d Cir. 1973); *McLeod v. General Electric Co.,* 366 F.2d 847, 849 (2d Cir. 1966), vacated on other grounds, 385 U.S. 533, 87 S.Ct. 637, 17 L.Ed.2d 588 (1967). To the contrary, where a legislative scheme calls for equitable relief to prevent violations of its terms, the Courts must act in accordance with traditional equity practice as conditioned by the necessities of the public interest which Congress sought to protect. *Hecht v. Bowles,* 321 U.S. 321, 329–330, 64 S.Ct. 587, 88 L.Ed. 754 (1944); *Seeler v. Trading Port, Inc.,* 517 F.2d 33, 40 (2d Cir. 1975). Preservation of the status quo is therefore an important consideration in determining whether equitable relief is "just and proper," *Seeler v. Trading Port, Inc., supra* at 38, as is the potential for irreparable injury. *Danielson v. Local 275 Laborers International Union of N. America, supra* at 1037. However, since section 10(j) was intended as a means of preserving or restoring the status quo as it existed before the onset of unfair labor practices, the courts will not grant or withhold injunctive relief to preserve a situation which has come into being as a result of the unfair labor practices being litigated. *Seeler v. Trading Port, Inc., supra* at 38. Moreover, in light of the purposes and intent of the National Labor Relations Act, considerations of irreparable harm will not focus upon the vindication of private rights. *Henderson v. International Union of Operating Engineers, Local 701,* 420 F.2d 802, 808 (9th Cir. 1969); *Minnesota Mining & Manufacturing Co. v. Meter,* 385 F.2d 265, 272 (8th Cir. 1967); *McLeod v. Compressed Air Workers, Local No. 147,* 292 F.2d 358, 361 (2d Cir. 1961). Rather, the courts are required to formulate equitable decrees which will further the public interest in maintaining respect for the law, encouraging the resolution of industrial disputes through collective bargaining, and promptly eliminating obstructions to the free flow of commerce. cf. S.Rep.No.105 80th Cong. 1st Sess. 8 (1947).

Inasmuch as the Court is guided by traditional principles in determining whether to grant injunctive relief pursuant to 29 U.S.C. § 160(j), the respondents have urged that petitioner's claim is barred by laches. In support of this equitable defense, they point out that petitioner has failed to seek injunctive relief as promptly as is required by internal directives issued from the Office of General Counsel. However, the doctrine of laches requires more than a mere showing of delay. That is, it requires a period of inexcusable delay followed by a change in circumstances which would make it inequitable to grant the relief requested. 2 Pomeroy, Equity Jurisprudence 5th ed. § 419(d).

Assuming that the Regional Director has failed to comply with the guidelines set forth by the Office of General Counsel in Memorandum 72–8, the Court could still not characterize the delay as inordinate. Nor have the respondents shown any change of circumstances which would make it inequitable to grant such relief. If anything, the delay has served the employers' economic interests insofar as they have not been required to negotiate a new, and presumably more costly, collective bargaining agreement. Finally, neither the employees nor the public should be required to abide a penalty imposed for Board delay, at least in the absence of immediate and substantial prejudice to the employer, since they exert no direct control over the Board's administrative processes. Cf. 3 Pomeroy's Equity Jurisprudence 5th ed. § 813.

Turning now to the heart of this controversy, the Court was pleased to discover that the employers' position in this dispute is uniquely charitable and wholly consistent with the humanitarian purposes

which the hospitals serve. Indeed, the nursing homes do not appear to contest their employees' desire to engage in collective bargaining through a union representative. Rather, they only question whether the local's affiliation reflects the intent of its membership. In view of these benign purposes, they argue that the standards for granting a preliminary bargaining order established in *Seeler v. Trading Port, Inc.*, 517 F.2d 33 (2d Cir. 1975) are entirely inapplicable. Instead, they urge the Court to deny petitioner's application for preliminary injunctive relief in reliance upon *McLeod v. General Electric Co.*, 366 F.2d 847, vacated on other grounds, 385 U.S. 533, 87 S.Ct. 637, 17 L.Ed.2d 588 (1967).

In *McLeod v. General Electric Co., supra*, an administrative complaint was issued alleging that the respondent had violated §§ 8(a)(1) and 8(a)(5) of the National Labor Relations Act by refusing to bargain collectively with the International Union of Electrical, Radio and Machine Workers, AFL–CIO (IUE). General Electric's refusal to bargain with the IUE occurred when representatives of other unions appeared at an IUE bargaining session. The company argued that their presence constituted an unlawful attempt to impose multi-union, company-wide bargaining. Complaints were then filed and the Regional Director sought a preliminary bargaining order pursuant to 29 U.S.C. § 160(j). The District Court granted the order as requested, finding that the petitioner had reasonable cause to believe that General Electric had been guilty of an unfair labor practice, and noting that the impact on the public interest was serious enough to justify a more expeditious form of corrective action than the Board's administrative processes would otherwise provide. 257 F.Supp. 690, 709. The Court of Appeals, on the other hand, found the Regional Director's position at best unsettled, and reversed the District Court's ruling after concluding that the petitioner had failed to demonstrate that the injunction was necessary to preserve the status quo or prevent irreparable harm. 366 F.2d at 850. In September of 1966, Justice Harlan stayed enforcement of the judgment rendered by the Court of Appeals pending a petition for certiorari, 87 S.Ct. 5, 17 L.Ed.2d 45, however, a new contract was negotiated on October 14, 1966, and the controversy was thereby rendered moot. 87 S.Ct. 639.

The precedential value of *McLeod v. General Electric, supra*, then remained somewhat amorphous until May of 1975, when the Second Circuit handed down its decision in *Seeler v. Trading Port, Inc., supra*. Here again the Regional Director had petitioned for a preliminary bargaining order pursuant to 29 U.S.C. § 160(j) because the respondent's serious and extensive violations of the National Labor Relations Act during an organizational campaign had destroyed the "laboratory conditions" upon which the elective process so necessarily depends. *N. L. R. B. v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). Nonetheless, relying on *General Electric, supra*, the employer argued that a bargaining order would constitute a radical form of relief by creating a bargaining relationship where none had previously existed and otherwise destroying the "status quo." The Court, however, rejected this argument forthright. First, the Court pointed out that in *General Electric, supra*, the Regional Director had adopted an unsettled position. By contrast, there was simply little doubt that Trading Port's activities were flagrantly violative of the National Labor Relations Act. Furthermore, the Court emphasized that the IUE and General Electric enjoyed an established bargaining relationship which could survive the period of administrative adjudication, whereas further delay in the *Trading Port* case would have made future bargaining impossible.

This Court finds similar distinctions applicable in the present case. To begin with, the only proof presented at the hearing indicated that, while a bargaining relationship had been established between the respondents and their employees, this relationship would be seriously jeopardized if contract negotiations were not undertaken while the Regional Director processed the underlying complaint. A preliminary bargaining order would therefore be consistent

with the rationale of *Trading Port, supra,* because it would prevent the employers from weakening the union by persisting in their unfair labor practices.

This leads to a second important distinction between *General Electric, supra,* and the present case. That is, unlike the situation in *General Electric,* the Regional Director's position here is well established. For assuming that he has reasonable cause to believe that Local 721, etc. is merely a continuation of the Licensed Practical Nurses of N. Y., Inc., the respondents will undoubtedly be required to recognize the affiliated local and negotiate with its representatives. See, *N. L. R. B. v. Newspapers, Inc.,* 515 F.2d 334 (5th Cir. 1975); *N. L. R. B. v. Commercial Letter, Inc.,* 496 F.2d 35, 39 (8th Cir. 1974); *N. L. R. B. v. Hershey Chocolate Corp.,* 297 F.2d 286 (3rd Cir. 1961); cf. *Abrams v. Carrier Corp.,* 434 F.2d 1234, 1243-1244 (2d Cir. 1970). Thus, as in *Trading Port, supra,* there can be little doubt that, by virtue of its own stipulation, the respondent is presently engaging in an unfair labor practice which will ultimately result in a Board issued bargaining order.

As noted earlier, the present case is unique because the employers have quite admirably been willing to recognize that their employees desire union representation, and question only whether the local is still the union of their choosing following its affiliation. For this reason, it may safely be assumed that the employer would be required to negotiate a new contract with some collective bargaining representative, regardless of its identity. Since it has been stipulated that the respondents' refusal to bargain is, for the purposes of this proceeding, an unfair labor practice, denial of a preliminary bargaining order would serve to perpetuate a violation of the Act. On the other hand, if the preliminary bargaining order is granted, it will serve to continue the bargaining relationship until the Board has had an opportunity to pass upon the representative capacity of Local 721. If the Board determines that the affiliated local is not a continuation of the original organization, the employees will be free to select a new representative for the next round of negotiations. If, however, petitioner's "reasonable cause" ripens into a finding that Local 721 is merely a continuation of the old union, the parties will be in precisely the same position that they would have occupied if the employers had not illegally refused to recognize the local following its affiliation.

Finally, the Court finds that irreparable harm is virtually inevitable if preliminary injunctive relief is denied. This conclusion follows from credible testimony which disclosed that there is a genuine potential for a strike in the absence of further negotiations. This type of disruption, particularly in the health care industry, is precisely the type of public injury which Congress has sought to prevent.[3] Furthermore, it is doubtful that a monetary figure can be attached to the loss of morale which the employees will suffer if their employers' illegal action, however beneficent its intent, is allowed to continue unabated. Similarly, if it is ultimately determined that negotiations should have taken place, it is doubtful that the employees will be able to assume as economically advantageous a position as they would have held if negotiations had continued throughout the period of administrative litigation.

On the other hand, no evidence was offered demonstrating that the employer might be irreparably injured if a preliminary bargaining order were granted. Indeed, such an order would merely require the employer to bargain with a representative of its employees—which is precisely what these employers would have been doing if the local had not sought international affiliation in May. The bargaining order would not, however, require the employers to negotiate from a position of weakness, nor would it require any contract which might be negotiated to extend for a given period of time.

---

**3.** Legislative History of the Coverage of Nonprofit Hospitals Under the National Labor Relations Act, 93rd Cong., 2d Sess. Committee Report No. 93–766 pp. 87–88, reprinted [1974] U.S. Code Congressional & Administrative News, pp. 3946, 3950.

Accordingly, since the Regional Director has reasonable cause to believe that an unfair labor practice is being committed, and since preliminary injunctive relief is necessary to preserve the "status quo" and prevent irreparable harm, it is hereby

ORDERED, that, pending the final disposition of the matters involved pending before the National Labor Relations Board, respondents, The House of the Good Samaritan and Samaritan-Keep Nursing Home, Inc., its officers, representatives, agents, servants, employees, attorneys, and all members and persons acting in concert or participation with them:

(1) Be, and they hereby are, enjoined and restrained from:

(a) Refusing to bargain collectively with Licensed Practical Nurses and Technicians of New York, Inc., Local 721, Service Employees International Union, AFL–CIO–CLC (hereinafter the Union), as the exclusive bargaining representative of all full-time and regular part-time Licensed Practical Nurses, including graduate Licensed Practical Nurses, permitted to practice as a Licensed Practical Nurse, excluding supervisors, technical employees, clerical employees, service and maintenance employees, RN's and all others employed by respondent or in any manner or by any means failing or refusing, upon request, to meet at reasonable times and bargain with the Union as such representative with respect to rates of pay, wages, hours of employment or any other term or condition of employment.

(b) In any like or related manner, interfering with, restraining, or coercing its Licensed Practical Nurses in the exercise of the rights guaranteed by Section 7 of the Act.

AND IT IS FURTHER ORDERED:

(2) That the respondents, upon request, bargain collectively with the Union as the exclusive representative of the employees in the bargaining unit herein above described, with respect to wages, rates of pay, hours of employment, and other conditions of employment; and, in the event that an under-standing is reached, embody such understanding in a signed agreement.

It is so ordered.