Sandra **DUNBAR, Regional Director of the Third Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,**

v.

**The PARK ASSOCIATES, INC., d/b/a Hill Park Health Care Center, Respondent.**

No. 98–CV–525 (FJS)(GJD).

United States District Court, N.D. New York.

Sept. 8, 1998.

214

Sandra Dunbar, Regional Director, National Labor Relations Board, Buffalo, New York (Ron Scott, of counsel), for Petitioner.

Williams Mullen Christian & Dobbins, Richmond, Virginia (James V. Meath, David C. Burton, of counsel), Costello Cooney & Fearon, Syracuse, · New York (Michael A. Tremont, Edward G. Melvin, of counsel), for Respondent.

Costello Cooney & Fearon, Syracuse, New York, for respondent, Edward G. Melvin, Michael A. Tremont, of counsel.

## MEMORANDUM–DECISION AND ORDER

SCULLIN, District Judge.

### Introduction

The Regional Director of the National Labor Relations Board ("NLRB" or "Board") filed this action alleging that Respondent, Park Associates, Inc., violated Section 8(a)(1) and Section 8(a)(5) of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. §§ 158(a)(1), (5), when it failed to recognize and bargain with the Union, and by interfering, restraining or coercing Park Associates' employees from exercising their rights. pursuant to Section 7, 29 U.S.C. § 157, of the Act. The Regional Director of the NLRB now seeks a preliminary injunction pursuant to Section 10(j) of the NLRA, 29 U.S.C. § 160(j), pending the resolution of unfair labor practice charges currently before the Board.

### Background

This case concerns the operation of a nursing home in Syracuse, New York, formerly known as Hill Haven Nursing Center ("Hill Haven"). On June 21, 1994, Local 200A, Service Employees International Union, AFL—CIO ("Union") was certified by the NLRB as the collective bargaining representative of a unit of employees employed by Hill Haven.[1] On March 1, 1995, Hill Haven and the Union reached a collective bargaining agreement ("CBA"), which was to remain in effect until February 28, 1998.

---

1. The bargaining unit is defined as: "All non-professional employees, including licensed practical nurses and other non-professional employees, excluding registered nurses, other professional employees, office clerical employees, guards and supervisors as defined in the Act."

On August 1, 1997, Hill Haven was sold to the Respondent who renamed it the "Hill Park Health Care Center." On that same day, the Union formally demanded that Respondent recognize and bargain with the Union.[2]

On August 14, 1997, one of Respondent's employees filed a union decertification petition with the NLRB. This petition was signed by 51 of the 93 bargaining unit employees, or approximately 54%.[3] As a result of the decertification petition, the NLRB held a decertification election on October 2, 1997. The election ballots have since been impounded by the NLRB pending the resolution of the unfair labor practice charges currently before the Board.

### Discussion

■ Section 10(j) of the NLRA authorizes federal district courts to grant preliminary injunctions pending the outcome of unfair labor practice proceedings before the Board. *See* 29 U.S.C. § 160(j).[4] Such relief should be granted where the Court finds that: (1) there is reasonable cause to believe that Respondent has violated the NLRA; and (2) injunctive relief is just and proper.[5] *See Kaynard v. MMIC, Inc.,* 734 F.2d 950, 953 (2d Cir.1984).

#### (A) Reasonable Cause to Believe NLRA Violated

■ In deciding the first question, the Court's role is not to determine whether an unfair labor practice actually occurred, but whether "there is reasonable cause to believe that an NLRB decision finding an unfair labor practice will be enforced by the Court of Appeals." *Kaynard v. Mego Corp.,* 633 F.2d 1026, 1033 (2d Cir.1980). Questions of fact must be construed in favor of the Re-

**2.** The Union also made similar demands prior to the sale.

**3.** During the last two weeks of July 1997, Respondent circulated a petition in support of the Union where more than 70 bargaining unit employees pledged their support.

**4.** Section 10(j) reflects Congress' recognition that, absent injunctive relief, the Board's often prolonged administrative proceedings might otherwise permit an unfair labor practice to go unremedied for long periods of time and thereby render a final Board order ineffectual. *See Sil-*

gional Director. *See Seeler v. Trading Port, Inc.,* 517 F.2d 33, 37 (2d Cir.1975); *Ahearn v. House of the Good Samaritan,* 884 F.Supp. 654, 659 (N.D.N.Y.1995). In doing so, the Court must accept the legal position of the Regional Director unless it is convinced that she is legally wrong. *See Ahearn,* 884 F.Supp. at 659. As this Court recently stated: "a district court should decline to grant relief only if convinced that the NLRB's legal or factual theories are flawed." *Dunbar v. Colony Liquor and Wine Distributors,* 1998 WL 437406, at *7, 15 F.Supp.2d 223, 231 (N.D.N.Y.1998) (quoting *Hoffman v. Polycast Tech. Div. of Uniroyal Tech.,* 79 F.3d 331, 333 (2d. Cir.1996)).

As stated, the Regional Director asserts that the Respondent violated Section 8(a)(1) by interfering with employees rights under Section 7 of the Act and also violated Section 8(a)(5) of the Act by not recognizing and bargaining with the Union beginning on August 1, 1997.

Section 7 provides, in relevant part, that: Employees shall have the right to self organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment. . . .

29 U.S.C. § 157. Sections 8(a)(1) and 8(a)(5) of the Act make it an unfair labor practice for an employer:

*verman v. Major League Baseball Player Relations Comm.,* 880 F.Supp. 246, 253 (S.D.N.Y.1995), *aff'd,* 67 F.3d 1054 (2d Cir.1995).

**5.** Petitioner also moved to hear the present motion solely on the basis of affidavits. Respondent opposed and argued that the Court should at least wait to obtain a transcript from the administrative law judge hearing. On August 18, 1998, the Court received the administrative transcript from the administrative hearing held June 9 and 10, 1998. *See Ahearn v. House of the Good Samaritan,* 884 F.Supp. 654, 658 (N.D.N.Y. 1995).

(1) to interfere with, restrain or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

\*   \*   \*   \*   \*   \*

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

29 U.S.C. §§ 158(a)(1), 158(a)(5).

In the present case, Respondent is considered to be a successor employer to Hill Haven.[6] Although successor employers are generally free to set the initial terms of employment for the previous owner's employees, an exception to this rule may exist when the successor makes it "perfectly clear" that it intends to retain all of the previous owner's former employees. If a perfectly clear exception is established, the new employer is prohibited from setting the initial employment terms without first bargaining with the union. *See NLRB v. Burns Int'l Sec. Serv.*, 406 U.S. 272, 294–95, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972); *Fall River Dyeing*, 482 U.S. at 41, 43, 107 S.Ct. 2225; *Canteen Co.*, 317 N.L.R.B. 1052 (1995). With regard to this question, the Second Circuit has stated that: "The important consideration in determining whether it is perfectly clear that a successor intends to retain all of the employees is whether they have all been promised re-employment on the existing terms." *Nazareth Regional High School v. NLRB*, 549 F.2d 873, 881 (2d Cir.1977); *see also Spruce Up Corp.*, 209 N.L.R.B. 194, 195 (1974).

The Regional Director found that the perfectly clear exception applied to the present case because there is evidence that Respondent's Vice President, Joseph Hugar, visited the nursing home on May 14, 1997, and assured employees that none of them would lose their jobs, that no changes would occur in the terms and conditions of their employment, and that Respondent expected to bargain with the Union.

The record supports a finding that Respondent, through its Vice President Mr. Hugar, misled employees at the May 14, 1997 meeting into believing that they would all be retained under the same employment terms as existed under the previous owner Hill Haven.[7] As such, the Court concludes that Respondent had a duty to recognize and bargain with the Union over the initial terms of employment as of August 1, 1997.

Having a duty to bargain, an employer commits an unfair labor practice under Section 8(a)(5) if it refuses to bargain collectively with the representative of its employees. Respondent argues, however, that it was justified in not bargaining with the Union because it had a good faith doubt as to whether the Union continued to receive the support from a majority of its members.

An employer can lawfully refuse to bargain with a union that it has previously recognized if it can show, based on objective factors, that (1) the union had in fact lost its majority support, or (2) that the employer had a good faith doubt as to the union's majority status. *See Harley–Davidson Transport. Co., Inc. v. Teamsters, Chauffeurs, Warehousemen and Helpers, Local Union No. 430*, 273 N.L.R.B. 1531 (1985).

To establish a good faith doubt as to the Union's continuing majority status, Respondent must produce "clear and convincing evidence of a loss of union support capable of raising a reasonable doubt of the Union's continuing majority." *Nazareth*, 549 F.2d at 880 (quoting *Retired Persons Pharmacy v. NLRB*, 519 F.2d 486, 489–90 (2d Cir.1975)); *see also N.L.R.B. v. Oil Capital Electric, Inc.*, 5 F.3d 459 (10th Cir.1993).

To support its good faith defense argument, Respondent submits evidence that on August 13, 1997, it received a copy of a decertification showing of interest which stated that 54% of the employees in the bargain-

---

**6.** An owner becomes a successor employer when "substantial continuity" exists with the former owner. *See Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 42–43, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987). In the present case, Respondent does not dispute that it is a "successor employer."

**7.** Notwithstanding Respondent's argument that Mr. Hugar also stated at the meeting that certain terms and condition would have to be negotiated in the future, the Court finds support for, and will defer to, the Regional Director's factual findings.

ing unit no longer wished to be represented by the Union.

■ The Regional Director asserts that Respondent's good faith defense is invalid because it is tainted by unfair labor practices. It is well settled that an employer may not claim a good faith doubt and refuse to bargain if it has committed unfair labor practices that would cause employee disaffection with the union. *See Medo Photo Supply Corp. v. NLRB*, 321 U.S. 678, 687, 64 S.Ct. 830, 88 L.Ed. 1007 (1944); *Rock–Tenn Co.*, 315 N.L.R.B. 670 (1994).[8] The Regional Director maintains that Respondent committed unfair labor practices on August 1, 1997, when it posted a wage and benefit bulletin adjacent to the employee time clock, which stated that "non-union employees" were eligible for wage increases up to 6%, which was 3% higher than previously offered by Hill Haven, and also when it placed a four-page pamphlet in each employee's time card slot, which urged employees to call Respondent's 1–800 employee hot line in regards to any employment concern or question they might have. The Regional Director claims that these actions violated Section 8(a)(1) of the NLRA because they each had the natural tendency to undermine and cause disaffection with the Union.

In determining first whether there is reason to believe Respondent violated the Act, the Court notes that an announcement or offer of benefits which is restricted to non-union employees is, under most circumstances, a per se violation of Section 8(a)(1) of the NLRA. *See Libbey–Owens–Ford Co. v. United Glass and Ceramic Workers of North America, AFL–CIO*, 285 N.L.R.B. 673 (1987); *Alaska Pulp Corp.*, 300 N.L.R.B. 232 (1990), enfd. mem., 972 F.2d 1341 (9th Cir. 1992). At the same time, some courts have also held that employers have the right to notify employees of new benefit plans or changes in employment conditions if the focus of the notice is descriptive in nature, rather than discriminatory. *See Firestone Synthetic Fibers v. NLRB*, 374 F.2d 211 (4th Cir.1967); *Goodyear Tire & Rubber Co. v. NLRB*, 413 F.2d 158 (6th Cir.1969). In the present case, the Court finds that the record,

as a whole, supports the finding that Respondent's wage and benefit posting was more discriminatory in nature than descriptive. This finding is supported by the fact that the benefit summary was posted at a time of traditional union instability, which leads the Court to believe that it may have been designed to diminish union support.

In determining whether there is reasonable cause to believe that the employee hotline advertisement violated the Act, the Court notes that a Section 8(a)(1) violation occurs when an employer solicits employee grievances which bypass traditional union grievance procedures if it has the natural tendency to erode employee support for the union. *See Forrest City Grocery Co.*, 306 N.L.R.B. 723, 729–30 (1992). In this respect, courts have stated that it is not the solicitation of grievances itself that is coercive and violative of Section 8(a)(1), but it is the promise of correcting these grievances that is unlawful. *See Uarco, Inc.*, 219 N.L.R.B. 523 (1975). The promise can be implicit as well. *See Springfield Jewish Nursing Home*, 292 N.L.R.B. 1266, 1274–1275 (1989). In the present case, the Court finds that there is sufficient evidence to support a reasonable belief that Respondent's invitation for employees to use its employee hotline encouraged disaffection.

In evaluating whether Respondent's conduct tainted the decertification petition, the NLRB looks to several factors, including: (1) the length of time between the unfair labor practices and the withdrawal of recognition; (2) the nature of the illegal acts, including the possibility of lasting detrimental effect upon employees; (3) any possible tendency to cause employee disaffection from the union; and (4) the effect of the unlawful conduct on employee morale, organizational activities, and membership in the union. *See Mathews Readymix, Inc.*, No. 20–CA–24698–2, 1997 WL 709946, 324 N.L.R.B. No. 152, slip op. at *4 (Nov. 7, 1997) (citing *Master Slack Corp.*, 271 N.L.R.B. 78, 84 (1984)).

Viewing these factors together, the Court finds that there is reasonable cause to find

---

**8.** It should also be noted that the period of transition from predecessor to successor is a time which the Supreme Court has acknowledged as

particularly "unsettling" for employees. *See Fall River*, 482 U.S. at 39–40, 107 S.Ct. 2225.

that Respondent's conduct caused employee disaffection with the Union at a time when employee support is traditionally unsettled. The effect of Respondent's conduct is quantifiable given that the Union enjoyed support from 75% of the bargaining unit in July, but only 45% support less than one month later. Viewing the record as a whole, the Court finds that there is reasonable cause to believe that this dramatic loss of support was caused by Respondent's alleged unfair labor practices.

In summary, the Court finds that Respondent, as a successor employer, did not have an objective good faith basis for refusing to recognize or bargain with the Union because the decertification petition was tainted by unfair labor practices. As such, the Court concludes that there is reasonable cause to believe that Respondent violated the NLRA and that such a decision would likely be enforced by the Court of Appeals.

### (B) Just and Proper Injunction Standard

The Regional Director asserts that the facts of this case demonstrate that an injunction is just and proper, and is necessary to prevent irreparable harm to the Union.

In assessing whether an injunction is appropriate under Section 10(j), the Court must follow the same general principles of equity ordinarily applied in assessing the propriety of injunctive relief, while acknowledging that injunctions are an extraordinary form of relief. *See Mego Corp.*, 633 F.Supp. at 1033. As such, the Court must determine whether an injunction is necessary to prevent irreparable harm and to preserve the status quo, while examining the balance of hardships between the parties. *See Ahearn v. House of the Good Samaritan*, 884 F.Supp. 654, 661–62 (N.D.N.Y.1995); *De-Prospero v. House of the Good Samaritan*, 474 F.Supp. 552, 559 (N.D.N.Y.1978). In addition, courts in this district require that the public interest, and not the concerns of private litigation, be considered in analyzing the need for this type of injunctive relief. *See Ahearn*, 884 F.Supp. at 661 (citing *Sil-*

*verman v. Imperia Foods, Inc.*, 646 F.Supp. 393, 397 (S.D.N.Y.1986)).

In the present case, Petitioner requests the restoration of the status quo ante in order to prevent further employee disaffection with the Union.[9] Specifically, Petitioner seeks a bargaining order, which would require Respondent to recognize and bargain in good faith with the Union. Absent interim relief, Petitioner argues that any further delays may permanently inhibit the Union from recovering the support from its former members.

Because the Court has found that there is reasonable cause to believe that Respondent violated the NLRA, further erosion of employee support for the Union is likely the longer it remains absent from the collective bargaining process. As this Court has stated: "If the respondents refuse to bargain with the Union and continue to withhold recognition, employee support will continue to erode to the point that any final order the NLRB might grant would be ineffective." *Id.* at 662. Furthermore, by requiring Respondent to do what it should have done in the first place, which is to recognize and bargain with the Union, there is neither an unnecessary or unreasonable hardship placed upon the Respondent. In addition, restoring the Union to its position as the bargaining agent would only be preserving the status quo ante. Given these circumstances, the Court finds that an injunction is required to prevent irreparable harm.

Lastly, the Court is required to consider the appropriateness and necessity of injunctive relief from a public interest perspective. In doing so, this Court has previously followed the lead of the First Circuit, as well as other circuits, which have only required a finding that "the public interest will not be adversely affected by the granting of the injunction." *Ahearn*, 884 F.Supp. at 663 (quoting *Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981)). In this case, Respondent has failed to articulate any basis whereby the public interest would be adversely affected if

9. Petitioner also requests that the Court order Respondent to reimburse the Union for its alleged unlawful refusal to remit pension benefit payments. Because the Court finds that this could ultimately be remedied monetarily, an injunction on this issue would be inappropriate.

an injunction is ordered. The Court has found none. Rather, it would seem that the public interest is best served by granting Petitioner's requested relief.

In summary, the Court concludes that there is reasonable cause to believe that Respondent has violated the NLRA and that an injunction is just and proper.

### Conclusion

Having considered the parties' submissions, the record, the transcript from the administrative hearing, and the applicable law, it is hereby

ORDERED that, pending the final disposition of the matters before the National Labor Relations Board, the Petition for an Injunction under Section 10(j) of the NLRA is GRANTED; it is further

ORDERED that, pending final Board adjudication, Respondent, its officers, representatives, agents, servants, employees, attorneys, and all other members acting in concert or participation with it, are hereby enjoined and restrained from:

(A) Failing to recognize and bargain with Local 200A, Service Employees International Union, AFL—CIO, as the exclusive collective bargaining representative of employees in the following unit:

> All non-professional employees, including licensed practical nurses and other non-professional employees, excluding registered nurses, other professional employees, office clerical employees, guards and supervisors as defined in the Act.

(b) In any like or related manner interfering with, restraining, or coercing employees in the exercise of their rights to self-organization, to form organizations, to join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, or to refrain from any and all such activities, except to the extent affected by an agreement requiring membership in a labor organization as a condition of employment, as authorized in Section 8(a)(3) of the NLRA.

IT IS FURTHER ORDERED that Respondent shall post copies of the District Court's Memorandum–Decision and Order at Respondent's Syracuse, New York facility where notices to employees are customarily posted; said postings shall be maintained during the pendency of the Board's administrative proceedings, free from all obstructions and defacements; and agents of the Board shall be granted reasonable access to Respondent's Syracuse, New York facility to monitor compliance with this posting requirement; and it is further

ORDERED that Respondent file with the Court, within 20 days of the issuance of the District Court's Order, a sworn affidavit from a responsible official of Respondent setting forth with specificity the manner in which Respondent has complied with the terms of this Memorandum–Decision and Order.

**IT IS SO ORDERED.**