Celeste J. MATTINA, Regional Director of Region 2 of the National Labor Relations Board for and on Behalf of the National Labor Relations Board Petitioner,

v.

CHINATOWN CARTING CORP. Respondent.

No. 03 Civ.7085(VM).

United States District Court, S.D. New York.

Sept. 30, 2003.

Margit Reiner, National Labor Relations Bd., New York City for Celest J. Mattina.

### DECISION AND ORDER

MARRERO, District Judge.

The Regional Director (the "Petitioner") of the National Labor Relations Board ("NLRB") filed this motion (the "Motion") alleging that Chinatown Carting Corp. ("CCC") violated Sections 8(a)(1), (3), (4), and (5) of the National Labor Relations Act (the "Act"), 29 U.S.C. §§ 160(*l*), by engaging in and continuing to engage in unfair labor practices, and asking for a preliminary injunction pursuant to Section 10(j) of the Act, 29 U.S.C. § 160(j), pending the resolution of unfair labor practice charges currently before the NLRB. A hearing was held before the Court on September 29, 2003 (the "Hearing"). At the end of the Hearing, the Court agreed to grant the Motion for a preliminary injunction. The Court proceeds to explain its findings, reasoning and conclusions.

## I. PROCEDURAL AND FACTUAL BACKGROUND

Between May 16, 2002 and July 9, 2003, Local 813, International Brotherhood of Teamsters, AFL–CIO (the "Union") and Domingo Hynes ("Hynes," and together with the Union, the "Complainants") filed a series of charges (the "Charges") with the NLRB alleging that CCC had engaged

in unfair labor practices that violated Sections 8(a)(1), (3), (4), and (5) of the Act.[1]

The Petitioner initially filed a Complaint and Notice of Hearing on December 26, 2002. After a series of orders consolidating the Charges and serving notice of a hearing (the "NLRB Hearing") before an administrative law judge (the "ALJ") of the NLRB on the Charges, the NLRB Hearing commenced on July 22, 2003, continued on July 23, 2003 and was adjourned until August 12, 2003, at which point the NLRB Hearing was completed. CCC was given notice of the NLRB Hearing, but did not appear at the NLRB Hearing on any of the three days it was held.[2]

In its Memorandum of Points and Authorities in Support of Petition for Injunction under Section 10(j) (" § 10(j)") of the Act, the Petitioner presents a twenty page recitation of the facts underlying this case. In summary, the Petitioner alleges that over the past several years, CCC, a New York corporation that carts garbage and recycling materials, has actively discouraged its employees from joining the Union, doing so through interrogations, threats of reprisals and layoffs, promises of benefits if one did not join the Union, and discharges of employees because of their Union activity. At the NLRB Hearing, several employees testified that Tragni had made most of these threats and decisions. On September 26, 2003, the ALJ ruled in favor of the Petitioner on all Charges.[3]

The Union has pursued some of these alleged violations through arbitration. In July 2002, the Union won an arbitration over the discharge of employee Doron Lyn ("Lyn") in violation of Section 8(a)(1), and CCC was ordered to pay back wages and fund contributions of approximately $29,000. The Petitioner claims that CCC has yet to pay this judgment. In addition, in September 2002, the Union won a $169,000 judgment in another arbitration because of CCC's failure to pay Union contributions on behalf of CCC's employees who belong to the Union. The Petitioner claims that CCC never paid this judgment either. On March 18, 2003, Judge Korman in the Eastern District of New York awarded the Union a default judgment of $122,109.56 in connection with the September arbitration.

In September 2002, Tragni came to the Union office and signed an agreement that stated CCC would be bound by a successor collective bargaining agreement negotiated between the Union and Waste Management of New York ("WMNY"). Such an agreement is referred to as a "Me–Too" Agreement. On October 30, 2002, the Union and WMNY signed a collective bargaining agreement. In subsequent meetings in April and May of 2003, however, CCC allegedly refused to sign a new collective bargaining agreement[4]—as had

1. Complainants filed a total of eight Charges during the time period. The Charges alleged, *inter alia,* that CCC had unlawfully discriminated against its employees in order to discourage membership in the Union and terminated certain employees for exercising the employees' rights under the Act.

2. While Damon Tragni ("D.Tragni"), the brother of CCC President Wayne Tragni ("Tragni") and the Secretary of CCC until January 2003, was questioned at the July 23, 2003 NLRB Hearing and was represented

there by counsel, his counsel only purported to represent D. Tragni and not CCC.

3. Despite this ruling, the matter before the Court is still relevant because the ALJ's decision is only a recommendation, which requires the Board's resolution of any exceptions by the Union to that decision. *See Kobell v. United Paperworkers Int'l Union,* 965 F.2d 1401, 1411 (6th Cir.1992).

4. CCC and the Union purportedly have been parties to collective bargaining agreements covering CCC's employees since at least 1972,

been its obligation pursuant to the Me Too Agreement—because it claimed that Tragni did not understand what he was signing when he executed the Me–Too Agreement. The Petitioner also contends that CCC claimed that the employees at issue were not CCC employees and were actually just friends who rode the sanitation trucks. Both the April and May meetings ended without a signed collective bargaining agreement between the Union and CCC.

## II. ARGUMENTS OF THE PARTIES

The Petitioner argues that CCC violated Section 8(a)(1) of the Act [5] through interrogations, threats of reprisals and layoffs, promises of benefits if an employee did not join the Union, and discharges of employees because of their Union activity. The Petitioner also contends that some of this behavior violates Sections 8(a)(3) [6] and (4) [7] of the Act. In addition, the Petitioner alleges that CCC's failure to both provide requested information in the bargaining sessions with the Union and sign a collective bargaining agreement after signing the Me–Too Agreement violates Sections 8(a)(1) and (5) [8] of the Act. As a result of these alleged violations, the Petitioner asks the Court to enjoin CCC from threatening, interrogating or discharging its employees if they support the Union. The Petitioner also requests that the Court compel CCC to reinstate certain discharged employees to their former positions, recognize and bargain in good faith with the Union, and fulfill CCC's obligations pursuant to the Me–Too Agreement.

CCC responds that the Petitioner has not sufficiently demonstrated that irreparable harm will occur without a preliminary injunction. Moreover, CCC argues that the Petitioner's sixteen-month delay between filing its first Charge against CCC and requesting injunctive relief from this Court demonstrates that there is no emergency justifying the Court to take action. Finally, CCC contends that preliminary relief is unwarranted because the relief being sought—reinstatement of certain terminated employees—is identical to the relief sought by the Petitioner in the administrative proceedings before the NLRB. CCC claims that the Petitioner did not pursue injunctive relief in those proceedings, and the Court should not simply function as a substitute for the exercise of the NLRB's power.

Along with these procedural objections, CCC also contends that Tragni had no authority to bind CCC to the Me–Too Agreement, that the vast majority of the alleged discriminatory behavior occurred

---

but the most recent one expired on July 31, 2002.

**5.** Section 8(a)(1) of the Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [§ 7 of the Act]." 29 U.S.C. § 158(a)(1). Section 7 provides in relevant part that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations." 29 U.S.C. § 157.

**6.** Section 8(a)(3) of the Act makes it an unfair labor practice for an employer to discriminate "in regard to hire or tenure of employment or any term or condition of employment [in order] to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).

**7.** Section 8(a)(4) of the Act makes it an unfair labor practice for an employer to "discharge or otherwise discriminate against an employee because he has filed charges or given testimony" regarding alleged unfair labor practices. 29 U.S.C. § 158(a)(4).

**8.** Section 8(a)(5) of the Act makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees...." 29 U.S.C. § 158(a)(5).

after the expiration of the collective bargaining agreement and that there are employees of CCC who are members of the Union.

## III. *DISCUSSION*

### A. *NATURE OF A § 10(J) INJUNCTION*

In general, Congress has granted jurisdiction over the adjudication of labor disputes to the NLRB, and, if necessary, has provided that the NLRB's rulings are to be enforced by the Courts of Appeals. *See Hoffman v. Laser Tool, Inc.*, No. 95 Civ. 246, 1995 WL 813689, at *1 (D.Conn. Dec.22, 1995). Consequently, district courts generally have no role in the resolution of labor disputes. The one exception to this rule is § 10(j) of the Act, which gives federal district courts "the power to grant temporary injunctive relief, pending the NLRB's resolution of an unfair labor practice charge, in order to restore the status quo or to preserve it as it existed before the commencement of the charged unfair labor practices." *Id.* Upon the conclusion of the NLRB's proceedings, a § 10(j) injunction expires automatically. *See Levine v. C & W Mining Co.*, 610 F.2d 432, 436–37 (6th Cir.1979).

### B. *STANDARD OF REVIEW*

Section 10(j) allows a district court to grant injunctive relief pending the outcome of unfair labor practice proceedings before the NRLB if the court finds that: (1) there is reasonable cause to believe that unfair labor practices have been committed and (2) the requested relief is just and proper. *See Kaynard v. MMIC, Inc.*, 734 F.2d 950, 953 (2d Cir.1984).

■ In deciding the first prong, the Court need not determine that "an unfair labor practice occurred, or that the precedents governing the case are in perfect harmony, but only that there is reasonable cause to believe that a [NLRB] decision finding an unfair labor practice will be enforced by the Court of Appeals." *Kaynard v. Mego Corp.*, 633 F.2d 1026, 1030 (2d Cir.1980). Reasonable cause, for § 10(j) purposes, exists when the Petitioner "has come forward with evidence sufficient to spell out a likelihood of [a] violation." *Danielson v. Joint Bd. of Coat. Suit. & Allied Garment Workers Union*, 494 F.2d 1230, 1234 (2d Cir.1974) (citation omitted). "The standard of review governing the NLRB's burden of demonstrating the existence of reasonable cause to issue a § 10(j) injunction is a deferential one." *Dunbar v. Northern Lights Enterprises, Inc.*, 942 F.Supp. 138, 144 (W.D.N.Y.1996).

■ In determining what is "just and proper," a court must act in accordance with the general rules of equity. *See Mego*, 633 F.2d at 1033. A § 10(j) injunction is just and proper if it restores the pre-unfair labor practice status quo and works to deter irreparable injury. *See Kaynard v. MMIC, Inc.*, 734 F.2d 950, 952–54 (2d Cir.1984); *Mego*, 633 F.2d at 1033.

■ Where there are disputed issues of fact, the Regional Director is entitled to assume facts and draw inferences in favor of the charging party, and, as long as his choice is rationally based and the court is not convinced that the Board's legal position is wrong, the court must sustain those findings and grant injunctive relief. *See Danielson v. International Org. of Masters, Mates and Pilots*, 521 F.2d 747, 751 (2d Cir.1975).

### C. *REASONABLE CAUSE*

The administrative record established at the NLRB Hearing and through exhibits submitted to the Court fully supports a finding of reasonable cause to believe that

the activity of CCC in interrogating, threatening and discharging employees violated Sections 8(a)(1), (3), (4) and (5) of the Act and thus constituted unfair labor practices.

1. *Interrogations in violation of Sections 8(a)(1) and (3)*

■ With regard to the alleged interrogations, courts in this Circuit that have examined employer interrogations have not considered them unlawful unless they are "coercive in light of all of the surrounding circumstances." *Retired Persons Pharmacy v. NLRB*, 519 F.2d 486, 492 (2d Cir.1975). In *Bourne v. NLRB*, 332 F.2d 47 (2d Cir.1964), the Second Circuit presented certain factors that should be considered in making such a determination, including the historical background of employer-employee relations at the company, the nature of the information sought, the identity of the questioner and his place in the company hierarchy, and the place and method of interrogation. *See id.* at 48.

Here, according to the record produced at the NLRB Hearing, Tragni interrogated both Lyn and Hynes about their involvement with the Union. Lyn's interrogation occurred on May 10, 2002, when Tragni called Lyn at home and asked him if he had signed a Union card the day before. When Lyn responded that he had, Tragni told Lyn that in order to keep his job, Lyn would have to call the Union and tell it that he only worked one night and therefore was not a regular employee. Lyn said he would think about it. The following day, while Tragni and Lyn were working in a sanitation truck alone, Tragni again inquired of Lyn whether Lyn was going to join the Union. When Lyn responded that he was not going to rescind his Union membership, Tragni told him that he would be forced to fire Lyn.

Both of these interrogations of Lyn fulfill the coercive test propounded by the Second Circuit. Tragni, the president of CCC, made direct inquires regarding Lyn's involvement with the Union and tied Lyn's future at the company to Lyn's discontinuing his Union membership. Calling Lyn at home and questioning him during his shift the next day adds to the coercive nature of the interrogation.

The same conclusion can reasonably be drawn from the interrogation of Hynes, which occurred in March 2003 when Tragni called Hynes to offer him an opportunity to return to work for CCC, where he had worked from 1998 until 2002, when he quit. The day after this offer, Tragni called Hynes again to ask him when and why he had signed for the Union. Hynes admitted he had signed for the Union, and Tragni never called Hynes again to offer any work.

■ Through this incident, the Petitioner presents a prima facie case that CCC withdrew its job offer to Hynes because Hynes signed with the Union, which is a violation of Section 8(a)(3) of the Act. *See TJ Signs, Inc. d/b/a American Signcrafters*, 319 NLRB 649, 1995 WL 682886, at *4 (N.L.R.B. Nov.8, 1995) (finding violation of Act because employer interrogated potential employee about his union activities and reneged on job offer when employer came to believe that employee was union member). Once a sufficient prima facie showing is made, the burden shifts to the employer to show that the same action would have taken place in the absence of protected conduct. *See Torrington Extend–A–Care Employee Ass'n v. NLRB*, 17 F.3d 580, 591 (2d Cir.1994). Here, CCC never appeared at the NLRB Hearing and thus did not meet its burden. As a result, there is reasonable cause to believe that an NLRB decision would find an unfair labor practice occurred in violation of the Act

with regard to the interrogations of both Lyn and Hynes.

### 2. Offer of Increased Benefits

██ Other courts in this Circuit have found acts similar to Tragni's promising Lyn increased benefits if he withdrew from the Union to be unfair labor practices in violation of the Act. *See, e.g., NLRB v. Chester Valley, Inc.,* 652 F.2d 263, 267 (2d Cir.1981). Thus, since the record at the NLRB Hearing shows that this incident occurred and CCC did not appear to rebut this evidence, there is reasonable cause to believe that an NLRB decision would find an unfair labor practice occurred in violation of the Act.

### 3. Unspecified Reprisals

██ The record shows that Tragni made several threats to his employees that they would be "damn sorry" if they interacted with the Union, would be "set straight" because they talked to the Union, and would learn "the fucking hard way" a lesson about not talking to the Union. Given the context of Tragni's previous comments to employees, these statements could provide reasonable cause to believe that an NLRB decision would find that an unfair labor practice occurred in violation of the Act, namely, threats to the employees' jobs because of their Union membership.

### 4. Threats of Layoffs and Plant Closure

██ "It is well-settled that threats of layoffs or other adverse economic consequences violate Section 8(a)(1) [of the Act] if they are motivated by or conditioned upon an employee's participation in a labor organization." *New York Univ. Med. Ctr. v. NLRB,* 156 F.3d 405, 410 (2d Cir.1998). The record at the NLRB Hearing shows that Tragni told employee Don Blyden ("Blyden") on March 10, 2003 that signing with the Union was going to force CCC to fire workers or sell the business, and that Blyden should let his co-workers know this to see if they still wanted to join the Union. This incident, which tied layoffs and other adverse economic circumstances to Union membership, provides reasonable cause to believe that an NLRB decision would find an unfair labor practice occurred in violation of the Act.

### 5. Discharges

██ Tragni's discharges of Blyden, Vernon Ford ("Ford"), Jan Sarach ("Sarach") and George Siao ("Siao") all provide reasonable cause for the NLRB to find that unfair labor practices occurred in violation of the Act. As discussed above, Tragni told Blyden that signing with the Union was a betrayal and would lead to layoffs and even the end of the business. The following day, Tragni called Blyden to tell him not to come to work until Blyden heard from him. While Blyden thought he had resolved the issue through a call to the Union, Tragni called him three days later to tell him that Blyden never worked for him and never would. Tragni also told Blyden that his friend Ford was no longer needed. With regard to Sarach, who also joined the Union, Tragni told him two days after threatening Blyden that Sarach was no longer working for him.

Siao actually attended the May meeting between the Union and CCC where CCC refused to sign the collective bargaining agreement. Two days after the meeting, Siao arrived at his shift only to find the sanitation trucks had already left. For the next few days, this pattern continued, despite Siao's efforts to arrive earlier and earlier at work, and Siao was eventually told by another employee that Tragni had ordered that Siao not be put to work. After a few weeks of this treatment, Siao

finally decided to stop showing up for work, and was never paid for the work he did from April 27 to 30 and May 2.

Since CCC did not rebut any of these allegations at the NLRB Hearing, the Petitioner's prima facie case regarding these discharges provides sufficient evidence to demonstrate violations of the Act, and thus provides reasonable cause to believe that an NLRB decision would find that an unfair labor practice occurred in violation of the Act.

6. *Failure to Sign the Collective Bargaining Agreement and Supply Requested Information*

 The record as presented at the NLRB Hearing shows that CCC refused to abide by the Me–Too Agreement that it had signed, which obligated it to be bound by the successor collective bargaining agreement between the Union and WMNY. Such a refusal is a clear violation of Sections 8(a)(1) and (5). *See B & M Linen Corp. d/b/a Miron & Sons Laundry,* 338 NLRB No. 2, 2002 WL 31093128, at *14 (N.L.R.B. Sept.16, 2002). Moreover, the record shows that CCC refused to negotiate in good faith and provide information to the Union, such as the names and dates of hire of CCC's employees. This refusal also is a violation of Sections 8(a)(1) and (5) of the Act. *See Great Southern Fire Protection, Inc.,* 325 NLRB 9, 1997 WL 728265 (N.L.R.B. Nov.7, 1997). Thus, with both of these incidents on the record, there is reasonable cause to believe that an NLRB decision would find an unfair labor practice occurred in violation of the Act.

D. *JUST AND PROPER STANDARD*

 The Petitioner has made several requests for injunctive relief. Most convincing is its request that CCC recognize and bargain in good faith with the Union as the sole collective bargaining representative of CCC's employees. As other courts in this Circuit have noted, employee support for a union is likely to erode the longer it remains absent from the collective bargaining process. *See Dunbar v. Park Associates, Inc.,* 23 F.Supp.2d 212, 218 (N.D.N.Y.1998). Furthermore, by requiring CCC to do what it should have done in the first place, which is to recognize and bargain with the Union, there is neither an unnecessary or unreasonable hardship placed upon CCC. In addition, restoring the Union to its position as the bargaining agent would only be preserving the status quo ante. Finally, providing the Union with the names and dates of hire of CCC's employees would allow the Union to properly do its job and interact with all of CCC's employees, while withholding such information could seriously hamper the Union's organizing efforts.

The Petitioner also asks that CCC be enjoined from (1) threatening employees with discharge, plant closure or unspecified reprisals if they join or support the Union, (2) interrogating them about their Union membership, (3) promising wage increases if they refrain from joining the Union, or (4) discharging and refusing to reinstate employees if they join or support the Union. Since all of these actions are clear violations of the Act, such an order for injunctive relief is not only reasonable, but necessary.

 More difficult is the Petitioner's request that CCC offer reinstatement to Blyden, Ford, Sarach and Siao to their former positions of employment without prejudice to their seniority, as well as to restore the offer of employment to Haynes. This request requires the biggest change to the status quo, and relies on the record created at the NLRB Hearing to conclude that these employees were

fired for their support of the Union, as opposed to other legitimate reasons. However, other district courts have ordered such reinstatements to prevent such discharges from sending the message to other employees that Union membership could jeopardize their jobs. *See Pye ex rel. N.L.R.B. v. Excel Case Ready*, 238 F.3d 69, 74 (1st Cir.2001) (upholding district court's finding that "failure to reinstate[ ] [the discharged employees] could have a serious adverse impact on employee interest in unionization").

In the instant case, such an adverse impact could be particularly likely given that there are only ten to twelve employees at CCC, so that even the discharge of one or two employees could send an anti-Union message. While CCC argues that the NLRB can reinstate the employees upon conclusion of its findings, there is no guarantee that such a decision will come anytime soon, and therefore further delay could lead to continued erosion in the Union's support. Indeed, the balance of harms weighs in favor of the Petitioner because further delay adversely effects the financial situation of the discharged employees, while reinstating them does not significantly impact the financial situation of CCC.

In § 10(j) rulings, a court also is required to consider the appropriateness and necessity of injunctive relief from a public interest perspective. *See Dunbar*, 23 F.Supp.2d at 218–19. In doing so, the Court need find only that "the public interest will not be adversely affected by the granting of the injunction." *Id.* (citation omitted). In the instant case, CCC has failed to articulate any basis under which the public interest would be adversely affected if an injunction is ordered. Thus,

the imposition of an injunction would be just and proper.[9]

## III. *ORDER*

For the reasons set forth above, it is hereby

**ORDERED** that Chinatown Carting Corp. be enjoined from threatening its employees with discharge, plant closure or unspecified reprisals if they join or support the Union; and it is further

**ORDERED** that Chinatown Carting Corp. be enjoined from discharging and refusing to reinstate employees or rescinding and refusing to restore offers of employment to employees because they joined or supported the Union or assisted in a Board investigation; and it is further

**ORDERED** that Chinatown Carting Corp. be enjoined from interrogating its employees about their Union membership; and it is further

**ORDERED** that Chinatown Carting Corp. be enjoined from promising wage increases if its employees refrain from joining the Union; and it is further

**ORDERED** that Chinatown Carting Corp. be enjoined from restraining or coercing its employees in the exercise of their Section 7 rights under the National Labor Relations Act; and it is further

**ORDERED** that Chinatown Carting Corp. recognize and bargain in good faith with the Union as the sole collective bargaining representative of Chinatown Carting Corp.'s unit employees regarding their wages, hours and other terms and conditions of employment; and it is further

**ORDERED** that Chinatown Carting Corp. provide the Union with the information it requested on April 10, 2003, which

---

**9.** In response to CCC's claim that there was a significant delay between the filing of the first Charge and the instant motion, it should be noted that the May 2002 Charge was the first in a series of Charges that continued through July 2003.

includes the names and dates of hire of Chinatown Carting Corp.'s employees; and it is further

**ORDERED** that Chinatown Carting Corp. comply with all terms and conditions of unit employees contained in the collective bargaining agreement between the Union and Waste Management of New York that the parties agreed to adopt in September 2002; and it is further

**ORDERED** that Chinatown Carting Corp. offer reinstatement to Don Blyden, Vernon Ford, Jan Sarach and George Siao to their former positions of employment without prejudice to their seniority and other rights and privileges, and upon their acceptance of such offers, reinstate them; and it is further

**ORDERED** that Chinatown Carting Corp. restore the offer of employment made to Hynes; and it is further

**ORDERED** that Chinatown Carting Corp. mail a copy of this Decision and Order to each of Chinatown Carting Corp.'s current employees as well as to Blyden, Ford, Sarach, Siao and Hynes; and it is finally

**ORDERED** that Chinatown Carting Corp. file with this Court, within twenty days of the date of issuance of this Decision and Order, a sworn affidavit from a responsible official of Chinatown Carting Corp. setting forth with specificity the manner in which Chinatown Carting Corp. is complying with the terms of this Decision and Order; and it is hereby

**ORDERED** that the preliminary injunction granted herein shall remain in force and effect until the adjudication of the NLRB charges at issue here becomes final, at which time the injunction shall expire automatically.

The Clerk of Court is directed to close this case, subject to its being reopened as necessary to enforce compliance with the Court's Order herein, for which purpose the Court shall retain jurisdiction over the matter and the parties.

SO ORDERED.