Karen P. **FERNBACH**, Regional Director, Region 2 NATIONAL LABOR RELATIONS BOARD, For and On Behalf of the National Labor Relations Board, Petitioner,

v.

**RAZ DAIRY, INC. and Metro Dairy Corp., as a Single Employer, Respondent.**

No. 12 Civ. 4179(JCF).

United States District Court, S.D. New York.

June 29, 2012.

James C. Rucker, National Labor Relations Board, New York, NY, for Petitioner.

Gary Schoer, Syosset, NY, for Respondent.

## MEMORANDUM AND ORDER

JAMES C. FRANCIS IV, United States Magistrate Judge.

On May 25, 2012, petitioner Karen P. Fernbach, Regional Director (the "petitioner" or the "Regional Director") for Region 2 of the National Labor Relations Board (the "NLRB" or the "Board"), instituted this action against respondent Raz Dairy, Inc. and Metro Dairy Corp. as a single employer (the "respondent"), pursuant to Section 10(j) of the National Labor Relations Act (the "NLRA" or the "Act"), 29 U.S.C. § 160(j). The petitioner issued a Complaint and Notice of Hearing on April 27, 2012, alleging that the respondent has engaged in unfair labor practices in violation of Sections 8(a)(1) and (3) of the Act. The Complaint alleges that the respondent (1) interrogated employees about their union activities and sympathies, (2) warned employees of plant closure if they bring in the union as their

bargaining representative, (3) threatened employees with discharge unless they refrained from engaging in union activities, (4) promised employees increased benefits and improved terms and conditions of employment if they refrained from engaging in union activities, (5) solicited employee complaints and grievances in order to deter unionization, and (6) discharged an employee because he engaged in union and concerted activities. The petitioner seeks an injunction enjoining the respondent from engaging in the charged conduct and reinstating the discharged employee pending the final disposition of proceedings before the NLRB. The parties have consented to proceed before me pursuant to 28 U.S.C. § 636(c). For the following reasons, the petition is granted.

*Background*

A. *Facts*

1. *Respondent's Operations*

The respondent consists of a pair of integrated companies engaged in the business of distributing dairy products to customers for resale. (Petition for Temporary Injunction under Section 10(j) of the National Labor Relations Act ("Pet."), ¶ 6(a); Complaint and Notice of Hearing, Case No. 02–CA–071508 ("Compl."), attached as Exh. 2 to Pet., ¶¶ 2, 3(a); Answer, Case No. 02–CA–071508 ("Ans."), attached as Exh. 3 to Pet., ¶¶ 1–3). The respondent is partially owned by Edward Zastenik, and Elvis Echevarria and Mohammed Abdallah are its main supervisors.[1] (Pet., ¶ 6(e); Compl., ¶ 5; Ans., ¶¶ 1–3; Zastenik Aff., ¶ 5). The respondent employs at least 16 drivers, at least

four office workers, two mechanics, and some loaders. (Abdallah Aff., ¶¶ 4, 8, 10–11). Mr. Abdallah hires most of the drivers, and communicates termination decisions to the subject employees. (Abdallah Aff., ¶¶ 5–6).

2. *Respondent's Allegedly Unlawful Conduct*

a. *Interrogation of Employees and Threats of Plant Closure and Discharge*

In September 2011, Luis Munoz, a delivery driver employed by the respondent, spoke to his co-worker Luis Perez, who provided him contact information for a union member employed at another milk and dairy distributor. (Affidavit of Luis Munoz dated Jan. 9, 2012 ("Munoz Aff."), attached as Exh. 4 to Pet., ¶ 4; Affidavit of Luis Perez dated March 8, 2012 ("Perez Aff."), attached as Exh. 5 to Pet., 58). A few days later, Mr. Munoz spoke to the union member about the benefits of obtaining union representation. (Munoz Aff., ¶ 5). Over the next couple of months, Mr. Munoz spoke to between 10 and 12 of his co-workers about unionization. (Munoz Aff., ¶ 6; Affidavit of Cristian Sanchez dated Feb. 9, 2012 ("Sanchez Aff."), attached as Exh. 6 to Pet., ¶ 6).

At approximately 1:30 p.m. on December 23, 2011, Mr. Echevarria allegedly called Mr. Munoz's mother-in-law, Myrna Altreche, whom he had known since 1992. (Affidavit of Myrna Altreche dated Jan. 10, 2012 ("Altreche Aff."), attached as Exh. 7 to Pet., ¶¶ 1, 3). Mr. Echevarria allegedly asked Ms. Altreche if Mr. Munoz was trying to unionize the respondent's employ-

---

1. Based on the affidavits of Mr. Zastenik, Mr. Abdallah and Mr. Echevarria, I have determined that Mr. Abdallah and Mr. Echevarria are supervisors within the meaning of the Act and agents acting on the respondent's behalf. 29 U.S.C. §§ 152(2), (11). (Affidavit of Edward Zastenik dated Jan. 24, 2012 ("Zastenik Aff."), attached as Exh. 10 to Pet., ¶ 5; Affida-

vit of Mohammed Abdallah dated Feb. 28, 2012 ("Abdallah Aff."), attached as Exh. 9 to Pet., ¶¶ 2–6; Affidavit of Elvis Echevarria dated June 11, 2012 ("Echevarria 2nd Aff."), attached as Exh. C to Response to Petition & Order to Show Cause for Temporary Injunction Under Section 10(j) of the National Labor Relations Act ("Resp. Memo."), ¶ 1).

ees, and stated, "[E]verybody is pointing the finger at him, and I can't have the union come in because they will put me out of business." (Altreche Aff., ¶ 3). Ms. Altreche said that she did not know whether this was true and suggested that Mr. Echevarria speak with Mr. Munoz directly. (Altreche Aff., ¶ 3). A few minutes later, Ms. Altreche called Mr. Munoz, told him about her conversation with Mr. Echevarria, and suggested that Mr. Munoz speak with him. (Munoz Aff., ¶ 7).

At the end of his shift that day, Mr. Munoz went to speak with Mr. Echevarria. (Munoz Aff., ¶ 8). According to Mr. Munoz, Mr. Echevarria "gestured that [they] should walk to the left corner of the building outside the office, away from the direction" of the other individuals present. (Munoz Aff., ¶ 8). Mr. Echevarria then allegedly told Mr. Munoz that the company believed he had been trying to unionize the drivers, stating, "Everyone is saying that you are trying to form a union, that you are the ring leader. Why do you want to bring in the union for?" (Munoz Aff., ¶ 8). Mr. Munoz replied:

> Well, basically we are tired of this. We are tired of the abuse—tired of working for six days and not get[ting] compensated. We don't get paid overtime. We always have to go through a war to get a day off, and the answer was always that "we don't have someone to replace you." It's a lot of us feeling the same way. You guys never do anything about it. You guys promised us benefits but you never did anything about it. You took away the 10% [pay cut one year ago] and never gave it back to us. It's a slap in the face when you see the owner driving a Mercedes Benz and our pay is low.... Listen, I am not the ring leader. I do talk to other truck drivers to see where we all stand in the union situation. Many of us think the same because we are tired of the abuse. But that doesn't make me the ring leader.

(Munoz Aff., ¶ 8). A few minutes later, Mr. Echevarria allegedly called Mr. Munoz into an office and asked whether he was "with [him] or ... with the union," and warned that the company would close if the employees unionized. (Munoz Aff., ¶ 9).

The following morning, December 24, 2011, Mr. Echevarria allegedly gave Ms. Altreche a "courtesy call" to inform her that the respondent would be terminating Mr. Munoz's employment that day, stating, "I am not going to let him put [me] out of business. I am sorry but today we are going to meet with him." (Altreche Aff., ¶ 4). When Ms. Altreche protested, Mr. Echevarria apologized again and ended the call. (Altreche Aff., ¶ 4). Ms. Altreche then called Mr. Munoz and related what Mr. Echevarria had said. (Munoz Aff., ¶ 10).

According to Mr. Perez, around 1:00 p.m. that afternoon, Mr. Zastenik, Mr. Abdallah, and Mr. Echevarria confronted him in the truck yard and told him that he had been identified by Mr. Munoz and other employees as "the leader" of the unionization effort. (Perez Aff., ¶ 9). Mr. Perez told the three men that it was Mr. Munoz, not himself, that was the leader and denied talking to anyone about the union. (Perez Aff., ¶ 9). Mr. Echevarria then allegedly told Mr. Perez that Mr. Munoz was going to be terminated, and warned that Mr. Perez would also be fired if he attempted to recruit his co-workers to join the union. (Perez Aff., ¶ 9).

b. *Termination of Mr. Munoz*

When Mr. Munoz finished his shift later that day, he went to see Mr. Echevarria, who directed him to see Mr. Abdallah. (Munoz Aff., ¶ 11). According to Mr. Abdallah, he informed Mr. Munoz that he was being laid off for economic reasons, telling him, "We don't need you for now. If things get better, I'll give you a call."

(Abdallah Aff., ¶ 19). Mr. Munoz, on the other hand, claimed that Mr. Abdallah told him that he was being terminated because his delivery route was being eliminated. (Munoz Aff., ¶ 11). Mr. Abdallah stated that he was "not sure" if he told Mr. Munoz that he was eliminating his route, but admitted that the route was not, in fact, eliminated. (Abdallah Aff., ¶ 19).

In his affidavit, Mr. Zastenik claimed that Mr. Munoz was fired because "he failed to properly perform his job duties and because there was strong and convincing evidence that he was stealing from the Company." (Zastenik Aff., ¶ 3). Specifically, Mr. Zastenik complained that Mr. Munoz: "had numerous tickets for double parking and for failing to stop at red lights," "more often than other drivers . . . reported damage to dairy products occurring as [a] result of his failure to properly secure items on his truck during delivery," "failed to complete the required paper work of the job, including daily vehicle . . . and customer credit reports," "often gave customers credits that they were not entitled to receive," and "[m]ost importantly, . . . failed to collect and return milk crates that had been delivered to customers[,] and his truck, upon return at the end of a daily route, contained less product than it should have based on [his] sales records." (Zastenik Aff., ¶ 9). In addition, Mr. Zastenik complained to Mr. Abdallah that Mr. Munoz was "taking the bridge when he was not suppose[d] to." (Abdallah Aff., ¶ 15).

Mr. Zastenik also stated in his affidavit that, at the end of November 2011, he met with Mr. Munoz and "warned him that the deficiencies in his performance were becoming intolerable," and that "failure to properly collect and account for crates, credits, cash receipts[,] and 'lost' product could not continue and that these failures led to the conclusion that some of the [c]ompany's money and/or property was ending up in his pocket." (Zastenik Aff., ¶ 11). According to Mr. Zastenik, Mr. Munoz continued to submit deficient vehicle inspection reports, milk crate pickup documentation, and daily invoice summaries. (Zastenik Aff., ¶ 12). Finally, Mr. Zastenik alleges that, on December 24, 2011, Mr. Munoz again returned to the worksite with insufficient paperwork, and when Mr. Zastenik asked him to explain the deficiency, Mr. Munoz stated "that the job was hard and that if [Mr. Zastenik] thought [he] could do it better, [he] could drive the route." (Zastenik Aff., ¶ 13). Mr. Zastenik then instructed Mr. Abdallah to terminate Mr. Munoz. (Zastenik Aff., ¶ 13).

Mr. Munoz, on the other hand, claims that, "[a]s far as I know, my truck or load was not short on December 24, 2011. In fact, as far as I know, my truck was never short. No one ever spoke to me about my truck being short, either on December 24, 2011, or on any other day." (Affidavit of Luis Munoz dated Feb. 9, 2012 ("Munoz 2nd Aff."), attached as Exh. 8 to Pet., ¶ 22). Mr. Munoz further claims that, "[f]rom the time I started driving my route to the time I was laid off, I never received any verbal or written warnings, or discipline about my work from [Mr. Abdallah] or anyone else" (Munoz 2nd Aff., ¶ 14), and he insists that Mr. Zastenik "never met with me in November 2011 about my work performance" (Munoz 2nd Aff., ¶ 15). Mr. Munoz also denies all of Mr. Zastenik's specific allegations concerning his work performance.[2] (Munoz 2nd Aff., ¶¶ 16–21).

---

2. Specifically, Mr. Munoz states that, "[w]hile driving for [the respondent], I had about one parking ticket every four months," and, "in 2011, I got about three or four parking tickets for double parking" (Munoz 2nd Aff., ¶ 16);

"I did not damage items because I did not load them[:] [m]y helper got into the truck and unloaded from the truck" and "secured the products on the truck" (Munoz 2nd Aff., ¶ 17); "I don't give credits to customers who

Mr. Abdallah explains that, when Mr. Zastenik listed his reasons for terminating Mr. Munoz, he "did not mention anything about traffic or parking tickets ... and I am not aware that [Mr.] Munoz has [a] traffic or parking ticket problem." (Abdallah Aff., ¶ 15). As for Mr. Munoz's taking the bridge, Mr. Abdallah states that "[t]here were instances" when Mr. Munoz obtained authorization to take the bridge, and he did not know of any reports that Mr. Munoz had used company funds to pay the bridge toll. (Abdallah Aff., ¶ 18). Mr. Abdallah also admits that "[m]any drivers do not bother to collect milk crates even though they were told to do so. No drivers had been fired for not collecting milk [ ] crates." (Abdallah Aff., ¶ 17).

Mr. Sanchez, who is currently employed as a driver by the respondent, claims that he "get[s] about two to four double parking tickets every week," and that "[n]o one from the company has spoken to [him] about the double parking tickets." (Sanchez Aff., ¶ 14). Mr. Sanchez also maintains that "[o]n average, two or three gallons of milk or juice break or [get] damage[d] daily," and that "[n]o one from management has ever spoken to [him] about the damaged products." (Sanchez Aff., ¶ 15). Mr. Sanchez further claims that Mr. Zastenik once informed him that he failed to collect 500 milk crates, but that he suffered no disciplinary consequences as a result. (Sanchez Aff., ¶ 13).

Six months after terminating Mr. Munoz and after the NLRB filed the instant petition, Mr. Zastenik provided a second affidavit in which he stated that:

[T]he primary and precipitating reason for [Mr. Munoz's] termination was that Mr. Munoz was caught, after previously being warned, with stealing from [the respondent]. The evidence reflecting this stealing was substantial. His cash receipts were not balanced to his sales tickets and his return of product at the end of daily deliveries was less than what he claimed was sold. When confronted and asked to explain, Mr. Munoz refused to admit his wrongdoing and was insubordinate.... Importantly, this was not the first time Mr. Munoz was confronted concerning evidence of stealing on his truck.

(Affidavit of Edward Zastenik dated June 11, 2012 ("Zastenik 2nd Aff."), attached as Exh. B to Resp. Memo., ¶¶ 3–4). Mr. Zastenik also claimed to have terminated 13 drivers since December 2009 for stealing from the company. (Zastenik 2nd Aff., ¶ 5). Finally, Mr. Zastenik challenged the credibility of Mr. Perez's affidavit, alleging that, "prior to Mr. Munoz['s] termination, [Mr. Perez] was scheming to leave [the respondent] and compete with it" by starting his own dairy delivery company. (Zastenik 2nd Aff., ¶ 6). Mr. Zastenik claimed that Mr. Perez's "goal" in corroborating the instant petition "is to enhance his business interests by having [the respondent] involved in extensive litigation." (Zastenik 2nd Aff., ¶ 6).

### 3. *Respondent's Subsequent Conduct*

A few days after Mr. Munoz was terminated, the respondent held a meeting with its drivers. (Abdallah Aff., ¶ 23; Sanchez Aff., ¶ 9). Mr. Zastenik, Mr. Echevarria, and Mr. Abdallah all maintain that the

---

were not entitle[d] to receive [them] because that [was] never my decision" (Munoz 2nd Aff., ¶ 17); "I collect all the milk crates from my customers" (Munoz 2nd Aff., ¶ 18); "[n]o one ever spoke to me about coming back from my route short of any inventory," and, "I never came back with an imbalance or short on products based on the sales records" (Munoz 2nd Aff., ¶ 19); "[n]o one ever talked to me about any 'inconsistent paperwork' that I may have done" (Munoz 2nd Aff., ¶ 20); and "[n]o one ever spoke to me about [my submission of toll bridge receipts] as having been a problem" (Munoz 2nd Aff., ¶ 21).

meeting in question was held not to discuss employee grievances, but rather, to discuss ways to improve business in light of the company's recent relocation. (Zastenik 2nd Aff., ¶ 7; Affidavit of Elvis Echevarria dated Feb. 22, 2012 ("Echevarria Aff."), attached as Exh. A to Resp. Memo., ¶ 17; Abdallah Aff., ¶ 23). According to Mr. Sanchez, however, Mr. Zastenik announced at the outset that the purpose of the meeting was to improve working conditions and asked the drivers what needed improvement. (Sanchez Aff., ¶ 9). In addition, Mr. Echevarria allegedly repeatedly solicited the employees to say what they wanted from the respondent. (Sanchez Aff., ¶ 9). One employee allegedly asked whether the respondent would "pay him for the sixth day of work or give him a day off," to which Mr. Zastenik affirmatively stated that he would "review it and take care of the issue." (Sanchez Aff., ¶ 9).

On December 27, 2011, Mr. Echevarria allegedly called Ms. Altreche again and requested that she "[t]ell [Mr. Munoz] to stop calling people from the job and talking to them about the union." (Altreche Aff., ¶ 5). Mr. Echevarria told her that if Mr. Munoz wanted a union job he would get him a job with a unionized employer, "and he will see that being in the union he won't benefit...." (Altreche Aff., ¶ 5). Afterward, Ms. Altreche called Mr. Munoz and told him what Mr. Echevarria had said; Mr. Munoz told her that "the workers were calling him about a meeting the company had with them." (Altreche Aff., ¶ 5).

Mr. Echevarria "den[ies] that [he] ever said that which Ms. Altreche claims [he] said" (Echevarria 2nd Aff., ¶ 3), and further, denies ever having made threats to any employee concerning their possible discharge for union activity or the company's closure, or even asking any employee about his interest in unionization (Echevarria Aff., ¶¶ 15–16, 18).

Approximately six weeks after Mr. Munoz was terminated, Mr. Sanchez described the conditions at the respondent's place of business as follows: "Before [Mr.] Munoz was fired, I would speak to my coworkers about joining a [u]nion.... They said that they wanted a union.... After [Mr.] Munoz was fired, I did not speak about the [u]nion and they did not speak to me about the [u]nion. All of us are afraid to get fired because the company had fired two or three people a few years ago when the drivers wanted to join a [u]nion and now they have just fired [Mr.] Munoz because he wanted to join a union." (Sanchez Aff., ¶ 19).

### B. *Procedural History*

Mr. Munoz filed the initial charge with the NLRB on December 28, 2011. (NLRB Charge, Case No. 02–CA–071508, attached as Exh. 1(a) to Pet.). The charge was amended on February 9, March 27, and April 20, 2012. (Amended Charges, attached as Exhs. 1(c), (e), (g), to Pet.). All charges were timely served. (Affidavits of Service attached as Exhs. 1(b), (d), (f), (h), to Pet.). On April 27, 2012, following the Board's investigation of the allegations, the Acting General Counsel, by the Regional Director, issued a Complaint and Notice of Hearing. The Regional Director then filed the instant petition on May 25, 2012, and on June 13, 2012, I heard oral argument on the instant petition. (Hearing Transcript dated June 13, 2012 ("Tr.")). An unfair labor practice hearing will be held before an administrative law judge of the NLRB beginning July 9, 2012. (Compl., at 6).

### Discussion

### A. *Legal Standard*

 Section 10(j) of the NLRA[3] gives federal district courts "the power to grant

---

3. Section 10(j) provides that:

The Board shall have power, upon issuance of a complaint ... charging that any person

temporary injunctive relief, pending the NLRB's resolution of an unfair labor practice charge, in order to restore the status quo or to preserve it as it existed before the commencement of the charged unfair labor practices." *Mattina v. Chinatown Carting Corp.*, 290 F.Supp.2d 386, 391 (S.D.N.Y.2003) (internal quotation marks and citation omitted). "In this Circuit, in order to issue a [Section] 10(j) injunction, the district court must first apply a two-prong test. First, the court must find reasonable cause to believe that unfair labor practices have been committed. Second, the court must find that the requested relief is just and proper." *Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d 360, 364–65 (2d Cir.2001).

### B. *Reasonable Cause*

 In deciding whether a Section 10(j) injunction should issue, "the district court does not need to make a final determination whether the conduct in question constitutes an unfair labor practice; reasonable cause to support such a conclusion is sufficient." *Id.* at 365. When considering a Section 10(j) petition, the court should "give considerable deference to the NLRB Regional Director." *Id.* "[W]here there are disputed issues of fact, the district court should draw all inferences in favor of the NLRB, and it should sustain the NLRB's version of the facts as long as it is 'within the range of rationality.'" *Blyer v. P & W Electric, Inc.*, 141 F.Supp.2d 326, 329 (E.D.N.Y.2001) (quoting *Kaynard v. Mego Corp.*, 633 F.2d 1026, 1031 (2d Cir.1980)). "[O]n questions of law, the Board's view should be sustained unless the court is convinced that it is wrong." *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1051 (2d Cir.1980) (internal quotation omitted); *see also Silverman v. J.R.L. Food Corp.*, 196 F.3d 334, 335 (2d Cir.1999) ("A court considering whether to grant temporary equitable relief pursuant to [Section 10(j)] ... should decline to grant relief only if the NLRB's legal or factual premises are fatally flawed."). "[T]he Regional Director is not required to show that an unfair labor practice occurred, or that the precedents governing the case are in perfect harmony, but only that there is 'reasonable cause to believe that a Board decision finding an unfair labor practice will be enforced by a Court of Appeals.'" *Mego Corp.*, 633 F.2d at 1032–33 (quoting *McLeod v. Business Machine and Office Appliance Mechanics Conference Board*, 300 F.2d 237, 242 n. 17 (2d Cir.1962)).

Under this deferential standard, the Regional Director has established reasonable cause to believe that the respondent has committed the unfair labor practices alleged in the petition.

#### 1. *Section 8(a)(1) Allegations*

Under Section 7 of the NLRA, employees have the right "to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection ...." 29 U.S.C. § 157. Section 8(a)(1) of the Act, in turn, makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exer-

---

has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred ... for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 160(j).

cise of the rights guaranteed in" Section 7. 29 U.S.C. § 158(a)(1).

The petitioner alleges several instances in which the respondent unlawfully interrogated employees regarding their support for unionization. "Threats or coercive interrogations of employees regarding their union activities constitute unfair labor practices in violation of Section 8(a)(1)." *NLRB v. Special Touch Home Care Services, Inc.*, 566 F.3d 292, 301 (2d Cir.2009). "'A violation is established if the questions asked, when viewed and interpreted as the employee must have understood the questioning and its ramifications, could reasonably coerce or intimidate the employee with regard to union activities.'" *Webco Industries, Inc. v. NLRB*, 90 Fed.Appx. 276, 285 (10th Cir.2003) (quoting *Presbyterian/St. Luke's Medical Center v. NLRB*, 723 F.2d 1468, 1475 (10th Cir.1983)).

Employer interrogation is unlawful if it is coercive in light of all the surrounding circumstances. *Retired Persons Pharmacy v. NLRB*, 519 F.2d 486, 492 (2d Cir.1975). The Second Circuit has identified several factors to be considered in making this determination, including "the historical background of employer-employee relations at the company, the nature of the information sought, the identity of the questioner and his place in the company hierarchy, and the place and method of interrogation." *Chinatown Carting Corp.*, 290 F.Supp.2d at 392 (citing *Bourne v. NLRB*, 332 F.2d 47, 48 (2d Cir.1964)). "An employer is not free to probe 'directly or indirectly into [an employee's] reason for supporting the union,'" *Beverly California Corp. v. NLRB*, 227 F.3d 817, 835 (7th Cir.2000) (quoting *TRW–United Greenfield Division v. NLRB*, 637 F.2d 410, 418 (5th Cir.1981)), and "[a]n interrogation need not contain explicit threats to be coercive." *Cumberland Farms, Inc. v. NLRB*, 984 F.2d 556,

559 (1st Cir.1993) (citing *NLRB v. Gogin*, 575 F.2d 596, 600 (7th Cir.1978)). "Any coercive effect can be occasionally neutralized," however, "by assurances that the questioning is not intended to interfere with the [employee's] right to organize." *NLRB v. Louisiana Manufacturing Co.*, 374 F.2d 696, 701 (8th Cir.1967) (citing *Edward. Fields, Inc. v. NLRB*, 325 F.2d 754 (2d Cir.1963)).

Here, the factual record and legal analysis presented by the Regional Director provide "reasonable cause to support [the] conclusion" that the respondent violated Section 8(a)(1). First, Mr. Munoz stated in his affidavit that, at the close of his shift on December 23, 2011, his supervisor, Mr. Echevarria, took him to a part of the workplace where no one else was present, told him that he had been identified as a leader of the unionization effort, and questioned him regarding his interest in the union. A few minutes later, Mr. Echevarria called Mr. Munoz into an office and asked whether he was "with [him] or ... with the union," and warned that the company would close if the employees unionized. Given that both of these interrogations were conducted by a direct supervisor in private, involved explicit inquiries into Mr. Munoz's involvement in the union, and concluded with a threat intended to discourage support for unionization, they can reasonably be viewed as coercive. *See, e.g., Basin Frozen Foods, Inc. and Teamsters, Food Processing Employees, Public Employees, Warehousemen and Helpers*, 307 NLRB 1406, 1415 (1992) (finding coercion where supervisor asked employee, "as part of an apparent pattern of company attempts to gather intelligence," and "[i]n the midst of talking about unrelated subjects," if the employee "knew anything about the union"); *Timsco Inc. v. NLRB*, 819 F.2d 1173, 1178 (D.C.Cir.1987) (deeming interrogation coercive where

manager questioned employee about union in manager's office with door closed); *NLRB v. Garon*, 738 F.2d 140, 143 (6th Cir.1984) (finding unlawful interrogation of several employees where questioning was conducted by employer's chief operating officer, officer did not assure employees that there would be no retaliation, responses of employees demonstrated fears about questioning, and questions were accompanied by threats of plant closure). As for "the historical background of employer-employee relations at the company," the evidence indicates that it has been contentious: Mr. Sanchez alleged in his affidavit that "the company had fired two or three people a few years ago when the drivers wanted to join a [u]nion" (Sanchez Aff., ¶ 19), and, consistent with this testimony, the petitioner represented at oral argument that, in 2009, "there was an organizing drive by a local union that failed ... in part ... because of unlawful activity by [the] respondent" (Tr. at 17–18). That the interrogations were undertaken by an employer with a recent history of anti-union hostility further suggests that they were coercive.

Second, Mr. Echevarria's threat that the company might close if the employees were to unionize constitutes a Section 8(a)(1) violation in itself. *See, e.g., New York University Medical Center v. NLRB*, 156 F.3d 405, 410 (2d Cir.1998) ("It is well-settled that threats of layoffs or other adverse economic consequences violate Section 8(a)(1) if they are motivated by or conditioned upon an employee's participation in a labor organization."); *Harper-Collins San Francisco, a Div. of Harper-Collins Publishers, Inc. v. NLRB*, 79 F.3d 1324, 1329 (2d Cir.1996) ("[A]n employer violates [Section] 8(a)(1) by, among other things, ... threatening to close a plant."); *Teamsters Local Union No. 171 v. NLRB*, 863 F.2d 946, 952 (D.C.Cir.1988) ("An employer may not interfere with employee organizational activities by threatening to

close his plant.") (citing *Textile Workers Union of America v. Darlington Manufacturing Co.*, 380 U.S. 263, 274 n. 20, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965)); *NLRB v. J. Coty Messenger Service, Inc.*, 763 F.2d 92, 97 (2d Cir.1985) (collecting cases).

Third, Mr. Echevarria, in the presence of Mr. Zastenik and Mr. Abdallah, threatened Mr. Perez with termination if he attempted to recruit his co-workers to join the union. Such conduct categorically violates the Act. *HarperCollins San Francisco*, 79 F.3d at 1329 ("It is well-established that an employer violates [Section] 8(a)(1) by ... threatening to discharge employees in retaliation for union activity."); *NLRB v. Gordon*, 792 F.2d 29, 32 (2d Cir.1986).

Finally, within only a few days of Mr. Munoz's termination, the respondent held a meeting with its drivers, solicited suggestions for improvement, and agreed to consider paying a "sixth day" or giving additional time off. As the petitioner correctly points out, the temporal proximity between the meeting and Mr. Munoz's termination provides reasonable cause to believe that the respondent unlawfully "solicited employee grievances and impliedly promised to remedy them" in an effort to discourage employee support for unionization. (Memorandum of Points and Authorities in Support of Petition for Temporary Injunction Under Section 10(j) of the National Labor Relations Act ("Pet. Memo."), at 12). *See Hospital Shared Services, Inc. and International Guards Union of America, Region 6 and Ty A. Powell*, 330 NLRB 317, 317 (1999); *see also Honeywell Electronic Materials Manufacturing, LLC and International Union of Operating Engineers, Local 280, AFL–CIO*, 352 NLRB 1139, 1141 (2008); *Reliance Electric Co.*, 191 NLRB 44, 46 (1971), *enfd.*, 457 F.2d 503 (6th Cir.1972).

In sum, there is reasonable cause to believe that an NLRB decision would find

that the conduct described above violated Section 8(a)(1) of the Act.

### ·2. *Section 8(a)(3) Allegations*

■ Section 8(a)(3) of the NLRA makes it an unfair labor practice for an employer to discriminate "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). In determining whether Section 8(a)(3) has been violated, the NLRB employs a burden-shifting framework. "First, the General Counsel of the NLRB must demonstrate that 1) the employee was engaged in protected activity, 2) the employer was aware of this activity, and 3) the employee's protected union activity was a substantial or motivating factor behind the employer's decision to take the adverse employment action." *NLRB v. Matros Automated Electrical Construction Corp.*, 366 Fed. Appx. 184, 187 (2d Cir.2010) (citing *Golden State Foods Corp.*, 340 NLRB 382, 385 (2003)). "If this burden of persuasion is met, the employer may avoid liability only if it demonstrates by a preponderance of the evidence that it would have reached the same decision absent the protected conduct." *NLRB v. G & T Terminal Packaging Co.*, 246 F.3d 103, 116 (2d Cir. 2001) (internal quotation marks and citation omitted). "However, if the evidence establishes that the reasons given for the [r]espondent's action are pretextual—that is, either false or not in fact relied upon— the [r]espondent fails by definition to show that it would have taken the same action for those reasons, absent the protected conduct, and thus there is no need to perform the second part of the ... analysis." *Golden State Foods*, 340 NLRB at 385. "Unlawful motive may be demonstrated not only by direct evidence but by circumstantial evidence, such as timing, disparate or inconsistent treatment, expressed hostility toward the protected activity, departure from past practice, and

shifting or pretextual reasons being offered for the action." *Real Foods Co.*, 350 NLRB 309, 312 n. 17 (2007) (internal citation omitted).

■ Here, the affidavits show that on December 23 and 24, 2011, the supervisors questioned Mr. Munoz and Mr. Perez about their protected union activity. Mr. Munoz denied being "the ringleader" of the unionization effort, but acknowledged his support for the union and admitted that he spoke to other employees about unionizing. Mr. Perez specifically identified Mr. Munoz as the leader of the unionization effort. This evidence sufficiently demonstrates the respondent's knowledge of Mr. Munoz's protected activity.

Furthermore, that the respondent harbored anti-union animus toward Mr. Munoz is clearly indicated in the affidavits of Mr. Munoz, Mr. Perez, and Ms. Altreche. Most significantly, Mr. Munoz stated that Mr. Echevarria threatened him that the company would close if the drivers unionized; Mr. Perez stated that Mr. Echevarria threatened him with termination if he attempted to recruit his co-workers to join the union, and immediately thereafter announced that Mr. Munoz would be fired; and Ms. Altreche stated that Mr. Echevarria expressed his disdain for Mr. Munoz's union activity on three separate occasions: on December 23, 2011, when he asked if Mr. Munoz was trying to unionize and complained that the union would put him out of business; on December 24, 2011, when he informed Ms. Altreche that he was terminating Mr. Munoz's employment because he was "not going to let [Mr. Munoz] put [the respondent] out of business"; and on December 27, 2011, when he requested that Ms. Altreche "[t]ell [Mr. Munoz] to stop calling people from the job and talking to them about the union." These statements sufficiently demonstrate

the respondent's animus toward Mr. Munoz's union activity.

Finally, both direct and circumstantial evidence establish reasonable cause to believe that this animus was the motivating reason behind Mr. Munoz's termination, including the timing of Mr. Munoz's discharge, his disparate treatment by the employer, the respondent's contemporaneous unlawful interrogations and threats, and "the shifting or pretextual reasons" asserted by the respondent in its defense. *See Real Foods Co.*, 350 NLRB at 312 n. 17.

The most direct evidence of ant-union motivation consists of (1) Mr. Echevarria's statements to Ms. Altreche concerning Mr. Munoz's impending termination for union activity, and (2) Mr. Perez's December 24, 2011 conversation with Mr. Zastenik, Mr. Echevarria, and Mr. Abdallah, in which he identified Mr. Munoz as the ringleader of the unionization effort and Mr. Echevarria announced that Mr. Munoz would be terminated. As the petitioner points out, Mr. Munoz was terminated just one day after Mr. Echevarria definitively learned of his support for unionization, and mere hours after Mr. Perez identified Mr. Munoz as the ringleader of the unionization effort. (Pet. Memo., at 16–17). Such close temporal proximity between the events strongly suggests that Mr. Munoz's discharge was based on his union activity. *NLRB v. American Geri–Care, Inc.*, 697 F.2d 56, 60 (2d Cir.1982) ("An inference of anti-union animus is proper when the timing of the employer's actions is 'stunningly obvious.'"); *NLRB v. Advanced Business Forms Corp.*, 474 F.2d 457, 465 (2d Cir. 1973) ("The abruptness of a discharge and its timing are persuasive evidence as to motivation.") (internal quotation marks and citation omitted); *see also Starbucks Coffee Company and Local 660, Industrial Workers of the World*, Case No: 2–CA–37548, 2008 WL 5351366 (N.L.R.B. Div. of

Judges, Dec. 19, 2008) ("The Board has long held that where adverse action occurs shortly after an employee has engaged in protected activity an inference of unlawful motive is raised.").[4]

Additionally, that the respondent's unlawful interrogations and threats occurred contemporaneously with Mr. Munoz's discharge supports an inference that the respondent was motivated by anti-union animus. *See, e.g., Flagstaff Medical Center, Inc. and Communications Workers of America, Local Union 7017. et al.*, 2010–11 NLRB Dec. P. 15472, 2011 WL 4498271, at *9 (NLRB Aug. 26, 2011) (finding discharge was motivated by anti-union animus where employer engaged in "numerous and varied violations of the Act," including interrogation of employees, "which occurred relatively close in time to [employee's] discharge"); *Lee Builders, Inc. and Alabama Carpenters Regional Council–Local 1274*, 345 NLRB 348, 349 (2005) (finding inference of animus where employer interrogated employee and then terminated him "just weeks later"); *see also Advanced Business Forms Corp.*, 474 F.2d at 465 ("[T]he [c]ompany's numerous other unfair labor practices designed to defeat unionism support the inference that [the employee's] discharge was for union activity.").

Finally, the evidence strongly suggests that the respondent's asserted reasons for terminating Mr. Munoz's employment are pretextual. For example, one month after firing Mr. Munoz, Mr. Zastenik complained that, among other things, Mr. Munoz had too many traffic and parking tickets, although Mr. Munoz's immediate supervisor was not aware of any such problem, and it appears that Mr. Munoz had significantly fewer parking tickets than other drivers. Mr. Zastenik also complained that Mr. Munoz reported

---

**4.** Westlaw does not list page numbers for this decision.

damage to products "more often than other drivers," although Mr. Sanchez, who is still employed by the respondent, says that, despite the "two or three gallons of milk or juice [that] break or [get] damage[d] daily" on his truck, "no one from management has spoken to [him] about the damaged products." Among the "most important[ ]" problems with Mr. Munoz's job performance, according to Mr. Zastenik, was his failure to collect and return milk crates that had been delivered to customers; yet, Mr. Sanchez was informed that he had failed to collect 500 milk crates and suffered no disciplinary consequences. Mr. Zastenik's assertion is further undermined by Mr. Abdallah's admission that "many drivers do not bother to collect milk crates even though they were told to do so.... [and] [n]o drivers had been fired for not collecting milk [ ] crates." In sum, such disparate treatment belies the respondent's contention that Mr. Munoz was terminated for cause. Rather, the evidence supports a finding of pretext.[5] *See NLRB v. Long Island Airport Limousine Service Corp.*, 468 F.2d 292, 294–96 (2d Cir.1972) (affirming NLRB finding of Section 8(a)(3) violation where discharged employee, who was "union 'spearhead' for organizing the [c]ompany's drivers," had been soliciting union support on day before abrupt discharge, and employer's asserted reasons that employee had poor employment record, had received traffic tickets, and submitted incomplete paperwork—including

"a particularly serious incident ... that involved missing cash collections" for which he was warned—were contradictory and pretextual, and where treatment of other employees for similar misconduct was disparate); *In re Pro–Spec Painting, Inc.*, 339 NLRB 946, 950–51 (2003) (finding pretext where employer "tolerated a lot worse than [the allegedly poor work performance of a union supporter who was terminated] without discharging the affected employees, even assuming that [the union supporter] did not perform satisfactorily in his last day of employment.").

Although the respondent disputes the NLRB's version of events (Resp. Memo., ¶ 4), it is "well within the 'range of rationality'" and therefore is entitled to deference. *P & W Electric, Inc.*, 141 F.Supp.2d at 329. Thus, the Regional Director has established "reasonable cause to support [the] conclusion" that Mr. Munoz was terminated because of his union organizing efforts and that the respondent would not have discharged him in the absence of his protected activity.

### C. *Just and Proper Relief*[6]

■■■■ "In this Circuit, injunctive relief under [Section] 10(j) is just and proper when it is necessary to prevent irreparable harm or to preserve the status quo as it existed before the unfair labor practice occurred." *Mattina v. Kingsbridge Heights Rehabilitation and Care Center,*

---

**5.** Somewhat curiously, in his second affidavit—provided six months after Mr. Munoz's termination and subsequent to the filing of the instant petition—Mr. Zastenik deemphasized "the combination of deficiencies in [Mr. Munoz's] work performance" that prompted his termination, and stated unequivocally that "the primary and precipitating reason" was Mr. Munoz's alleged theft from the company on December 24, 2011 (and his "insubordinate" retort to Mr. Zastenik's accusation that he was stealing); such "shifting ... reasons

being offered for the action" further suggest an unlawful motive. *Real Foods Co.*, 350 NLRB at 312 n. 17.

**6.** As the respondent has indicated that it would consent, without admitting any culpability or wrongdoing and reserving all of its rights to contest the NLRB complaint at the administrative hearing, to all injunctive relief sought by the petitioner except reinstatement of Mr. Munoz, I will only discuss reinstatement here.

No. 08 Civ. 6550, 2008 WL 3833949, at *24 (S.D.N.Y. Aug. 14, 2008) (quoting *Inn Credible Caterers*, 247 F.3d at 368 (internal quotation marks omitted)), *aff'd*, 329 Fed.Appx. 319 (2d Cir.2009); *see also Kaynard v. MMIC, Inc.*, 734 F.2d 950, 953 (2d Cir.1984) ("The conditions as they existed before the company's unlawful campaign must be re-established."); *Seeler v. Trading Port, Inc.*, 517 F.2d 33, 38 (2d Cir. 1975) ("[S]ection 10(j) was intended as a means of preserving or restoring the status quo as it existed before the onset of unfair labor practices."). "[I]nterim relief may [also] be necessary where serious and pervasive unfair labor practices threaten to render the Board's processes 'totally ineffective' by precluding a meaningful final remedy." *Mego Corp.*, 633 F.2d at 1034 (discussing *Trading Port*, 517 F.2d at 39); *see also Silverman v. Whittall & Shon, Inc.*, No. 86 Civ. 1675, 1986 WL 15735, at *1 (S.D.N.Y. June 6, 1986) ("[T]emporary injunctive relief [is] 'just and proper' in cases where the circumstances would make it 'possible for persons violating the Act to accomplish their unlawful objective before being placed under any legal restraint and thereby to make it impossible or not feasible to restore or preserve the status quo.'" (internal citation omitted)).

Although "it is not for [the court] to 'make a final determination' as to whether [the respondent] has engaged in the alleged unfair labor practices," *Kingsbridge Heights*, 2008 WL 3833949, at *24 (quoting *Inn Credible Caterers*, 247 F.3d at 365), the record amply demonstrates that there is reasonable cause to believe that the respondent engaged in an unlawful course of conduct, including its termination of Mr. Munoz, designed to extinguish the nascent organizing efforts of its drivers. In so doing, the respondent has chilled, if not eradicated, its employees' interest in unionization. Failure to grant the injunctive relief sought by the Regional Director would irreparably harm the employees' ability to exercise their right to unionize.

Moreover, the Regional Director here is not seeking relief based upon a novel interpretation of the federal labor laws—this case does not involve an "unprecedented application of the Act." *Silverman v. 40–41 Realty Associates, Inc.*, 668 F.2d 678, 680–81 (2d Cir.1982). Rather, "the prevailing legal standard is clear and the only dispute concerns the application of that standard to a particular set of facts." *Id.* at 681. In cases involving "fundamental and well-established tenets of federal labor law" such as this one, "deference to the Regional Director's considered decision that injunctive relief is necessary to ensure the effectiveness of the NLRB's remedial procedures and to further the policies of the Act is 'especially appropriate.'" *Kingsbridge Heights*, 2008 WL 3833949, at *25 (quoting *40–41 Realty Associates, Inc.*, 668 F.2d at 681).

Therefore, under these circumstances, reinstatement of Mr. Munoz is necessary to reestablish the status quo as it existed before the unfair labor practices occurred and reassure the respondent's employees that their Section 7 rights are not illusory. *See, e.g., Palby Lingerie*, 625 F.2d at 1053 (holding that where active and open union supporter is improperly discharged and where such discharge risks serious adverse impact on employee interest in unionization, order of reinstatement is just and proper); *P & W Electric,* 141 F.Supp.2d at 330 (ordering reinstatement of three key union supporters in bargaining unit of 15 employees because termination created risk of adverse impact on organizing drive) (collecting cases); *Whittall & Shon*, 1986 WL 15735, at *1 (S.D.N.Y. June 6, 1986) (finding that, if improperly discharged union supporters were not reinstated, "the employer would have effectively gained all the desired benefits from its alleged

wrongdoing because no other worker in his right mind would participate in a union campaign ... after having observed that other workers who had previously attempted to exercise rights protected by the Act had been discharged"); *Hoffman v. Cross Sound Ferry Service, Inc.*, Civil No. H–81–929, 1982 WL 2016, at *6 (D.Conn. Feb. 22, 1982) (ordering reinstatement of union supporter "to facilitate the resurrection of the unionization campaign that was effectively halted by the unfair labor practices allegedly committed by the respondent.").

The respondent maintains that "a motion for an injunction under these circumstances is held in abeyance pending review by the [d]istrict [c]ourt of the administrative hearing record and after an [a]dministrative [l]aw [j]udge decision." (Resp. Memo., ¶ 8; Tr. at 19). This is incorrect. Although a district court *may* postpone consideration of a Section 10(j) petition pending completion of the Board's administrative hearing on the complaint, *see Palby Lingerie*, 625 F.2d at 1050, it is not required to do so. *See, e.g., Kingsbridge Heights*, 2008 WL 3833949, at *24 ("[T]he Court of Appeals has held [that] aggressive remedial relief is necessary in appropriate labor cases, and that where an equity court has 'reasonable cause' to believe that particularly flagrant unfair labor practices have been committed, the court's fashioning of those remedies typically framed by the Board in an unfair labor practice proceeding is 'just and proper,' even though a final decision by the Board is pending." (quoting *Morio v. North American Soccer League*, 632 F.2d 217, 218 (2d Cir.1980) (internal quotation marks omitted))); *Mattina v. Flat Rate Movers, Ltd.*, No. 10 Civ. 4169 (S.D.N.Y.) (Order dated July 12, 2010) (ordering reinstatement of discharged employees absent NLRB hearing); *P & W Electric*, 141 F.Supp.2d at 330 (ordering reinstatement of discharged workers after NLRB hearing but before decision issued).

The respondent further asserts that "upsetting the current status quo" by reinstating Mr. Munoz prior to the Board's adjudication of the matter "would be premature, unnecessary, and unwarranted" where, as here, the respondent "vigorously" contests that Mr. Munoz's termination was unlawful; the hearing on the matter is imminent; and the hearing is necessary to resolve "substantial" credibility issues, including whether "there may be an issue of dual motivation" underlying Mr. Munoz's termination. (Resp. Memo., ¶¶ 6–7).

For purposes of deciding the instant motion, however, the existing evidentiary record is sufficient. The respondent has already been given the opportunity to defend its position in the underlying investigation, its response to the petition, and oral argument, and witness testimony from both parties has been submitted in affidavit form. (Tr. at 16). And, as discussed, the version of events presented by the Board is well within the range of rationality, and therefore controls resolution of factual disputes, no matter how vigorously the respondent may protest. Of greater concern is the fact that NLRB administrative proceedings can be "prolonged" (Tr. at 13–14): by the time the Board issues its decision, as the petitioner argues, Mr. Munoz "will have accepted employment elsewhere and will be understandably reluctant to disrupt once more his and his family's lives in order to return to his former job." (Pet. Memo., at 22). Such a scenario would allow the respondent "to accomplish [its] unlawful objective" of defeating unionization "before being placed under any legal restraint," *Whittall & Shon*, 1986 WL 15735, at *1, and render a Board-ordered reinstatement meaningless. In such circumstances, reinstatement is just and proper. *See Ahearn*

*v. McGuire*, No. 94–CV–650S, 1994 WL 721371, at *9 (W.D.N.Y. Oct. 27, 1994) (" 'If the discharged employees must wait until the Board's final order ... they most likely will have found work elsewhere ... [and the employer] will have succeeded in removing the union organizers and the union from its facility. This is precisely the situation Congress sought to avoid by enacting [S]ection 10(j).' ") (quoting *Aguayo v. Tomco Carburetor Co.*, 853 F.2d 744, 749 (9th Cir.1988)).

The respondent further argues that, "in light of the fact that should the [p]etitioner ultimately prevail [at the administrative hearing], Mr. Munoz has an adequate remedy at law in that he will be able to receive back pay upon reinstatement." (Resp. Memo., ¶ 7). However, the relief sought by the Board is not sought on behalf of Mr. Munoz, but the respondent's remaining employees and the public policy interest in "protect[ing] efforts at unionization." (Tr. at 20). *See Trading Port*, 517 F.2d at 40. Mr. Munoz's eventual reinstatement after a long-term absence, even with an award of back pay, would not suffice to "prevent irreparable harm [to the employees' exercise of their Section 7 rights] or to preserve the status quo as it existed before the unfair labor practice occurred." *Kingsbridge Heights*, 2008 WL 3833949, at *24. Nor, despite the respondent's arguments to the contrary, will the other consented-to relief "more than adequately serve this purpose." (Resp. Memo., ¶ 7).

The respondent next insists that "[r]einstatement of an employee who was stealing from the [r]espondent would be disruptive to the [r]espondent's business." (Resp. Memo., ¶ 7). However, in light of the considerable evidence suggesting that anti-union animus, and not Mr. Munoz's alleged misconduct, was the motivating reason behind his discharge, it cannot be concluded that reinstatement of Mr. Munoz would be so disruptive as not to be just and proper.

*See P & W Electric*, 141 F.Supp.2d at 330 (ordering reinstatement of union supporter alleged to have intentionally "creat[ed] problems with [the company's] customers"); *McGuire*, 1994 WL 721371, at *9 (ordering reinstatement of two union supporters despite claim they had mistreated patients at respondent's nursing facility). Moreover, the respondent would not be barred from lawfully discharging Mr. Munoz for misconduct after he is reinstated. *See P & W Electric*, 141 F.Supp.2d at 332.

Finally, the respondent argues that reinstatement is not appropriate in this case because the complaint was filed by a single individual, and "not a union that was attempting to organize and was being thwarted." (Tr. at 12). The respondent cites no authority, however, and I have located none, that suggests that reinstatement is not a proper remedy under these circumstances.

*Conclusion*

In conclusion, there is reasonable cause to believe that the respondent engaged in unfair labor practices and the injunctive relief requested by the Regional Director pursuant to Section 10(j) of the NLRA is just and proper. Accordingly, the petitioner's application is granted.

IT HEREBY IS ORDERED, that the respondent, its officers, agents, servants, employees, attorneys, and other persons acting in concert or participating with them, be and they hereby are, enjoined and restrained, pending the final disposition of the matters involved herein pending before the National Labor Relations Board, from, in any manner, or by any means:

A. interrogating employees about their support for a union;

B. threatening employees with plant closure if they support a union;

C. threatening employees with discharge if they support a union;

D. promising employees improved working conditions if they refrain from supporting a union;

E. soliciting grievances from employees and implicitly promising to remedy those grievances in order to discourage employees from supporting a union;

F. discharging or laying off employees because they supported a union or engaged in other concerted, protected activities and in order to discourage employees from engaging in those activities; or

G. in any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed by Section 7 of the Act; and it is further

ORDERED that the respondent, its officers, agents, and representatives shall:

A. Within five (5) days of the issuance of this Court's order, offer Luis Munoz, in writing, immediate reinstatement to his former position, without prejudice to his seniority or other rights and privileges previously enjoyed, displacing, if necessary, any employee hired, transferred, or reassigned to replace him;

B. Within five (5) days of the issuance of this Court's order, post copies of the District Court's Order in this proceeding, and a translation of this Order in Spanish approved by the Regional Director, at the Employer's facility at 215 Lake Avenue, Yonkers, NY, at all locations where Employer notices to employees are customarily posted; maintain said postings during the term of this Order, ensure that all employees shall have free and unrestricted access to said postings; and grant agents of the Board reasonable access to said facilities to monitor compliance with this posting requirement;

C. Within ten (10) days of issuance of the Court's Order, hold a meeting or meetings at Respondent's facility, scheduled to ensure the widest possible audience of employees, at which a responsible management official, in the presence of a Board agent (or, at Respondent's option, a Board agent, in the presence of a responsible management official), shall read the Court's Order, and that an interpreter, paid for by Respondent, translate that speech into Spanish; and

D. Within twenty (20) days of issuance of this decree, file with the District Court, with a copy served to the Regional Director, Region 2, a sworn affidavit from a responsible official setting forth with specificity the manner in which the Employer is complying with the terms of the decree.

SO ORDERED.